UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CHASE MORTIMER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:19-cv-01735 **(Consolidated)** |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | Honorable Virginia M. Kendall |
| DIPLOMAT PHARMACY, INC., et al., | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | ) ) ) | |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4823-1352-6958.v1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

JURISDICTION AND VENUE .......................................................................... 8

PARTIES ............................................................................................................ 9

    Plaintiffs ...................................................................................................... 9

    Defendants ................................................................................................... 9

FACTUAL BACKGROUND .............................................................................. 10

    Industry Background .................................................................................. 10

    Diplomat's Specialty Pharmacy Business ................................................. 12

    Diplomat's Expansion into the PBM Business ........................................... 13

    During the Class Period, Defendants Terminated Legacy PBM Management and Discarded NPS's Claims Processing Software, Leading to Poor Service and Client Losses ..................................... 17

DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ................. 18

    February and May 2018 False and Misleading Statements Regarding Integration and Clients ................................................................. 19

    August 2018 False and Misleading Statements Regarding Integration and Clients ......... 24

    September 2018 False and Misleading Statements Regarding Integration and Clients ................................................................................. 28

    November 2018 False and Misleading Statements Regarding Integration and Clients ................................................................................. 31

    Class Period False and Misleading Statements Regarding Internal Controls .................. 34

THE TRUTH IS REVEALED .............................................................................. 36

    November 2018 Disclosures ....................................................................... 36

    January 2019 Disclosures .......................................................................... 37

    February 2019 Disclosures ........................................................................ 39

Page

November 2019 Disclosures ................................................................................. 43

ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 44

Defendants Controlled the Company's Messaging to the Investing Public ................... 44

Defendants Were Responsible for and Closely Monitored the Failed PBM
    Integration .................................................................................................... 46

Defendants' Public Statements Support a Strong Inference of Scienter ........................ 48

The Scope and Severity of the Service Failures and Customer Departures Support
    a Strong Inference of Scienter ....................................................................... 49

Executive Departures Support a Strong Inference of Scienter ......................................... 53

Defendants' Obligations Under GAAP Support a Strong Inference of Scienter .............. 53

Defendants Had Motive ...................................................................................................... 56

LOSS CAUSATION AND ECONOMIC LOSS ............................................................. 57

PRESUMPTION OF RELIANCE ................................................................................. 60

NO SAFE HARBOR ..................................................................................................... 62

CLASS ACTION ALLEGATIONS ............................................................................... 63

COUNT I ......................................................................................................................... 65

For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against
    Diplomat and the Individual Defendants ........................................................ 65

COUNT II ........................................................................................................................ 66

For Violation of §20(a) of the Exchange Act Against Defendants Park, Griffin,
    and Kavthekar ............................................................................................... 66

PRAYER FOR RELIEF ................................................................................................. 67

DEMAND FOR TRIAL BY JURY .............................................................................. 68

- ii -

Plaintiffs, individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiffs' attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Diplomat Pharmacy, Inc. ("Diplomat" or the "Company"), Company press releases and earnings call transcripts, public information regarding Diplomat including information posted on the Company website, and analyst reports and media reports about the Company and the industry. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This securities class action is brought on behalf of all purchasers of Diplomat common stock between February 26, 2018 and November 11, 2019, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

2.      Diplomat was founded in 1975 and operated as a private company until it became publicly-traded in 2014. Diplomat was historically a specialty pharmacy, which differed from traditional pharmacies because, among other things, it dispensed high-cost drugs that require special care in handling (such as refrigeration) or administration (such as injection). Diplomat grew to become the largest independent specialty pharmacy in the United States.

3.      Generally, Diplomat's business involved filling prescriptions for people who had either private insurance or Medicare. Diplomat would be paid by payers or pharmacy benefit managers ("PBMs"). Payers are entities such as health insurers, self-insured employers, or self-funded organizations like unions. PBMs are hired by payers to administer certain or all aspects of

- 1 -

their pharmaceutical drug plan benefits, including negotiating rebates with manufacturers, establishing lists of approved drugs, or selecting and contracting with the pharmacies or specialty pharmacies.

4.     Notably, from 2009 to 2014, Diplomat's revenues increased from $377 million to $2.2 billion, and its EBITDA[1] increased from $6 million to $35 million.  Based on this rapid growth, Diplomat was an attractive investment when it went public in October 2014 and raised $173 million issuing common stock trading on the New York Stock Exchange ("NYSE").  In its first year as a public company, Diplomat continued to grow, with 2015 revenues increasing to $3.4 billion (a 52% increase from 2014), and EBITDA increasing to $95 million (a 170% increase from 2014).

5.     Diplomat had another solid year in 2016, but its rapid growth slowed.  One of Diplomat's largest PBM customers increased its fees, which negatively impacted Diplomat.  For example, compared to the 52% increase in revenue in 2015, Diplomat's revenue grew just 31% in 2016 to $4.4 billion.  Diplomat's growth in profitability took a bigger hit as, compared to its 170% increase in 2015, Diplomat's 2016 EBITDA grew just 13% to $107 million.

6.     In 2017, Diplomat's business took a sharp turn for the worse.  More specifically, PBMs began to acquire specialty pharmacies, which decreased the demand for stand-alone specialty pharmacy services, like those provided by Diplomat.  PBMs that had integrated pharmacies were seen as more favorable by some customers because they could offer "bundled services" that included both traditional PBM services and specialty pharmacy services.  Since Diplomat did not have a PBM business, it simply could not offer those same bundled services and lost significant contracts in 2017.

---

[1]     EBITDA stands for earnings before interest, taxes, depreciation, and amortization.  Analysts and investors use EBITDA to assess a company's profitability.  Herein, "EBITDA" refers to the Company's "adjusted" EBITDA, which excludes non-recurring costs, such as acquisition expenses, in order to purportedly reflect recurring profitability from normal business operations.

7.      Due to the loss of hundreds of millions of dollars in contracts that were bid against PBMs with integrated specialty pharmacies, Diplomat's business performance declined.   As compared to the 13% increase in EBITDA in 2016, Diplomat's 2017 EBITDA declined by 5% to $102 million.  Diplomat's rising, and then collapsing, EBITDA growth rates leading up to the Class Period are illustrated in the following chart:



8.      In response, Diplomat's co-founder and then Chief Executive Officer ("CEO"), Phil Hagerman ("Hagerman") decided to acquire two PBM businesses so Diplomat could also offer bundled services.  In November 2017, Diplomat engaged in the largest acquisitions in its history, paying $647 million to acquire National Pharmaceutical Services ("NPS") and LDI Integrated Pharmacy Services ("LDI").  Diplomat targeted NPS and LDI because they were small- to mid-market PBMs, and that market competed for business based on service, rather than strictly on price (where larger PBMs had an advantage).  Hagerman emphasized that this massive investment was an "incredible opportunity for Diplomat" and necessary "to compete on the business where we were unable to move the needle in the past."

4823-1352-6958.v1

9.      Hagerman emphasized three keys to the success of launching the PBM business. First, rather than compete on price for the largest payers in the country, Diplomat would focus on providing exceptional service to win business in the small- and mid-size market.  Second, Diplomat needed to retain the PBM customers it already had through the acquisitions, which required keeping legacy management and sales forces from NPS and LDI who had those customer relationships and could help Diplomat cross-sell its specialty pharmacy services.  Third, in acquiring NPS, Hagerman highlighted NPS's valuable and "proprietary" claims processing system – the software that automates payers' drug plans – which was supposed to be used to implement the new PBM business's customizable services.

10.     Then, in January 2018, Hagerman retired, and defendant Jeffrey Park ("Park") became the Interim CEO until replaced by defendant Brian Griffin ("Griffin") as CEO.  Defendants Park and Griffin, along with defendant Joel Saban ("Saban") (Diplomat's President) and defendant Atul Kavthekar ("Kavthekar") (Diplomat's Chief Financial Officer ("CFO") and Treasurer) abandoned Hagerman's three keys to success in the PBM business and decided to terminate key employees from NPS and LDI and abandon NPS's proprietary claims software.  After being in business for more than 40 years, those decisions combined to lead to massive customer losses and service failures, which, in less than two years, caused Diplomat's business to decline so rapidly that it recently announced it may not be able to continue.  Diplomat's stock price, after trading as high as $28 per share during the Class Period, collapsed to $3 per share, and investors now wait to learn whether Diplomat will be acquired or possibly go bankrupt.

11.     This case arises, not because of defendants' (defined herein) poor business decisions that led to Diplomat's collapse, but because, during the Class Period, defendants concealed from investors the massive integration and service failures that were leading to the customer complaints

- 4 -

and losses. As a result, investors suffered hundreds of millions in losses when the truth was revealed.

12. The Class Period begins one month after Hagerman's retirement. Throughout the Class Period, defendants concealed that their decisions to terminate key members of the legacy PBM management and abandon NPS's proprietary claims processing system had led to poor quality and massive service failures, customer complaints, and lost customers.

13. For example, defendants made numerous false and misleading statements that concealed the negative impact these changes were having on the PBM business and instead claimed they were "**building stronger relationships with our clients**"; they were "**extremely pleased**" with "**the actual conversations**" they were having with PBM clients; the process of "**taking 2 legacy PBMs and . . . putting them on to a single platform [has] been going extremely well**"; and the PBM integration process was "**going really, really well**" and was "**ensuring our patient and client experiences are strong**."[2] In truth, as defendants later admitted, the integration was a total failure, the transition away from NPS's platform caused massive service failures and customer complaints, and customers decided not to renew their business due to the service and integration failures, all of which negatively impacted Diplomat's financial performance to the point where the Company is uncertain if it can remain in business.

14. As a result of defendants' false and misleading statements, Diplomat's stock price traded at artificially inflated prices of over $20 per share during the Class Period, reaching as high as $28 per share. Then, defendants shocked investors in a series of disclosures that revealed the truth and directly contradicted their Class Period statements. For example, after market close on November 6, 2018, defendants admitted that the Company had lost 25% of the entire PBM business.

---

[2] Emphasis has been added to the particular statements alleged to be false and misleading.

Diplomat's stock price plummeted in response, falling from a close of $20.34 on November 6, 2018 to a close of $14.80 on November 7, 2018, erasing more than 27% of the Company's market capitalization ($410 million) in a single day. Defendants mitigated the effects of the negative disclosures by claiming the lost contracts were just "one-off[s]."

15. On January 7, 2019, Diplomat announced an "additional $120 million combined revenue impact from client losses," admitted that "there is no question that [the PBM business] disappointed in 2018," and admitted the client losses were "primarily the result of poor execution on client retention." At the same time Diplomat corrected the prior misrepresentations, it started firing the wrongdoers. Diplomat announced the termination of the employment of defendant Saban and the President and CEO of the PBM business, Albert Thigpen ("Thigpen"), "effective immediately." As a result of the January 7, 2019 disclosures, the price of Diplomat common stock declined again, falling from a close of $14.10 on January 4, 2019 to a close of $12.62 on January 7, 2019, erasing more than 10% of the Company's market capitalization ($110 million) in a single day.

16. More bad news was delivered on February 22, 2019, when Diplomat announced that it was not even able to file its 2018 annual report on Form 10-K ("2018 Form 10-K") on time, it was withdrawing its 2019 guidance (issued less than two months earlier), and it would be writing down the value of its NPS and LDI acquisitions due to the "reduced financial forecasts for the PBM businesses." The Company admitted that the "previously disclosed execution challenges experienced in 2018 continue to impact customer perception and have resulted in further customer losses." On this news, the price of Diplomat common stock declined again, falling from a close of $13.46 on February 21, 2019 to a close of $5.87 on February 22, 2019, erasing more than 56% of the Company's market capitalization ($565 million) in a single day as analysts complained that "the weakness in its PBM segment is even worse than feared."

- 6 -

17.     Finally, on <u>November 12, 2019</u>, Diplomat admitted it was on the verge of bankruptcy after again writing down the value of its NPS and LDI acquisitions and reporting 3Q19 PBM revenue of just $82 million, a more than 50% decline from the same quarter in the prior year.[3] Defendant Griffin admitted that Diplomat "continued to experience client losses" and the Company said it might not be able to meet its credit agreement terms "which violation would give the lenders the right to terminate funding of our revolving line of credit, accelerate our debt (including amounts under our term loans), or foreclose on our assets." On this news, Diplomat stock plummeted again, from a close of $6.20 on November 11, 2019 to a close of $3.10 on November 12, 2019, erasing 50% of the Company's market capitalization ($230 million) in a single day.

18.     After four decades in business, the following chart shows the rapid decline in Diplomat's stock price as the Company began to reveal the true facts and the artificial inflation caused by defendants' Class Period false and misleading statements was removed:

---

[3]     Specific quarters in a year are designated by the quarter number followed by the letter "Q." Thus, 3Q19 indicates Diplomat's third quarter in 2019.

4823-1352-6958.v1



## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

21.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  Diplomat transacts business and has offices in this district, Diplomat's PBM business, "CastiaRx," is headquartered in this district, certain defendants reside in this district, and the false and misleading statements alleged herein entered this district.

22.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

23.     Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Lead Plaintiff") purchased shares of Diplomat common stock during the Class Period.  *See* ECF No. 47-1.

24.     Named Plaintiff Eugene Klabak ("Klabak") purchased shares of Diplomat common stock during the Class Period.  *See* ECF No. 24-2.

25.     Lead Plaintiff and Klabak are collectively referred to herein as "plaintiffs."

**Defendants**

26.     Diplomat is headquartered in Flint, Michigan.  In 2017, Diplomat purchased two PBMs (NPS and LDI) and in 2018 relaunched Diplomat's PBM business as CastiaRx, headquartered in Bannockburn, Illinois.  Diplomat common stock trades on the NYSE, under the ticker symbol "DPLO."

27.     Defendant Park served as a director of Diplomat from June 2017 to February 22, 2019, when he resigned more than a year before the conclusion of his three-year term.  Park was Diplomat's Interim CEO from January 2018 to May 2018.

28.     Defendant Saban served as President of Diplomat from August 2017 to January 4, 2019, when he signed a separation and release agreement terminating his employment "effective immediately."  Saban resides in Buffalo Grove, Illinois.

29.     Defendant Kavthekar served as CFO and Treasurer of Diplomat starting in May 2017, and served as the Company's Interim CEO from May 2018 to June 2018.  On March 14, 2019,

- 9 -

Kavthekar signed a separation and release agreement terminating his employment effective April 5, 2019. Kavthekar resides in Naperville, Illinois.

30.     Defendant Griffin has been the CEO and Chairman of the Board of Directors (the "Board") of Diplomat since June 2018.

31.     Defendants Griffin, Park, Saban, and Kavthekar are herein referred to as "Individual Defendants." The Company and the Individual Defendants are referred to herein, collectively, as the "defendants."

## FACTUAL BACKGROUND

**Industry Background**

32.     Generally, pharmaceutical manufacturers develop or acquire pharmaceutical drugs, set prices for their drugs, and then sell them to wholesalers (in bulk) at a negotiated discount. The wholesalers then sell the drugs to pharmacies for a profit. Once a physician writes a prescription for a drug, the patient will take the prescription to the pharmacy or specialty pharmacy who fills the prescription for a profit. If the patient is an employee or member of a payer, the pharmacy is paid by submitting a claim to the payer, seeking approval to fill the prescription. If the payer approves the claim, the patient will be charged a flat-fee ("copay"), and the payer will reimburse the pharmacy for the remainder of the drug price, plus a fee for the pharmacy's services.

33.     In the alternative, payers often contract with PBMs to administer their pharmaceutical drug programs for their beneficiaries. PBMs will provide various services in this role, for example, establishing lists of approved pharmaceutical drugs that the payers will cover ("formularies"), negotiating price on behalf of the payers, and negotiating with manufacturers for rebates.

34.     In addition, PBMs establish a network of pharmacies to serve as the pharmacies of record for the payer and its beneficiaries. The PBM sets payment rates and rules for the pharmacies

to follow in submitting claims and filling the pharmaceutical drugs. This network of pharmacies can include retail pharmacies, mail-order pharmacies, and specialty pharmacies.

35.     Retail pharmacies, such as Walgreens, are generally designed to carry inventories of low-cost, high-volume products like prescription pills and liquids. Mail-order pharmacies generally serve the same role, but carry out the process by phone and mail, rather than at a physical location. In contrast, specialty pharmacies fill and deliver high-cost, low-volume products that require special care in handling or administration, which retail and mail-order pharmacies are ill-equipped to handle. Examples of specialty pharmaceutical products include injectable (*e.g.*, by needles and syringe), infusible (*e.g.*, by IV drip), or inhalable medications. Because of their specialized nature, payers that use PBMs will still sometimes choose to contract directly with a specialty pharmacy, rather than delegate that role to the PBM.

36.     To administer the paperwork through this entire process, PBMs (like NPS and LDI) utilize claims processing systems. This computer software automates the process of receiving, approving, and denying claims; creating payments to pharmacies; and sending invoices or explanations of benefits to beneficiaries. It can also create processes to ensure government compliance, track data, and provide payers with visibility to monitor its pharmaceutical drug program. The ease of use, reliability, security, accuracy, and speed of a claims processing system can be selling points to payers interested in PBM services.

37.     In short, PBMs serve as "middle-men" in the pharmaceutical industry. The flow of money, services, and products is generally summarized in the following graphic:

- 11 -



38.     Larger PBMs, with more covered "lives" (*i.e.*, the number of beneficiaries) are more effective at negotiating lower prices or higher rebates.  As a result, there has been a lot of consolidation, with approximately 75% of the market now dominated by three PBMs – CVS Caremark, Express Scripts Holding Company ("Express Scripts") and OptumRx.  These "Big 3" PBMs sell their services principally to large, nationwide payers and compete primarily on price.

39.     The remaining 25% of the PBM industry, which had included NPS and LDI, focuses on smaller payers, such as self-insuring employers or labor unions.  While price is also important to these payers, they also tend to consider the services, and the quality and customization of those services, in selecting a PBM.  So, for example, a smaller payer with limited resources might be more interested in a "bundled services" provider that could customize services based on the needs of the payer.

**Diplomat's Specialty Pharmacy Business**

40.     Diplomat is the largest independent specialty pharmacy in the United States.  It was founded in 1975 by Hagerman and his father.  Hagerman served as Diplomat's CEO and Chairman of the Board from 1991 until he retired in January 2018.

- 12 -

41.     Diplomat went public in October 2014, issuing shares of stock at $13 per share.  In 2015, Diplomat reported revenue of $3.4 billion (a 52% increase from 2014) and EBITDA of $95 million (a 170% increase from 2014).

42.     As noted, growth slowed in 2016, and profitability declined in 2017 as PBMs began to acquire specialty pharmacies and offer bundled services that some customers found more attractive than the stand-alone services offered by Diplomat.  In February 2017, Diplomat announced that it had failed to renew three contracts with payers that were expected to generate $500 million of revenue.  For two of them, the payers switched to using PBMs with bundled services.  As Hagerman explained on November 6, 2017, "we, frankly, could not compete, and we weren't able to win that business . . . because they're asking us for things that we did not have."  For most of 2017, Diplomat's stock traded near its initial public offering levels, at around $13-$18 per share.

**Diplomat's Expansion into the PBM Business**

43.     Hagerman determined Diplomat could not succeed solely as a specialty pharmacy and decided to "accelerate[] [Diplomat's] long-term plan of adding PBM-like services."  In a first step, Diplomat retained executives with PBM experience to build and run the business.  Specifically, Diplomat appointed defendant Park as a director in June 2017.  Prior to joining Diplomat, Park was the Chief Operating Officer ("COO") of OptumRx, the third largest PBM in the country.  He previously spent nine years as the CFO and then Executive Vice President of Operations at Catamaran Corporation ("Catamaran"), a large provider of PBM services acquired by OptumRx in 2015.  Diplomat also hired defendant Saban as President of Diplomat in August 2017.  Saban had spent 20 years in executive positions at CVS Caremark – the largest PBM in the country – and Catamaran.  Upon Saban's hiring, Hagerman announced that Diplomat was "moving in th[e] direction" of acquiring a PBM to add those services and capabilities.

- 13 -

44.     Shortly after bringing on defendants Park and Saban, the Company announced the PBM acquisitions.  On November 6, 2017, Diplomat announced the acquisition of NPS, a PBM based out of Omaha, Nebraska, for $47 million.  NPS's customer base included group health plans and Medicare, with 475,000 lives and annual EBITDA of $5 million.  One week later, on November 15, 2017, Diplomat announced the acquisition of LDI, a PBM based in St. Louis, Missouri, for $600 million.  LDI's customer base included higher-margin, self-insured employers and organizations, with annual EBITDA of around $41 million.  Hagerman described LDI as having a "very, very large book of profitable business."

45.     In total, Diplomat paid $647 million to enter the PBM business, representing Diplomat's largest transaction ever – by more than $250 million.  In connection with the acquisitions, Diplomat recorded an intangible asset of $447 million, called "goodwill."[4]  Under generally accepted accounting principles ("GAAP"), Diplomat was required to periodically review the goodwill and write off all or some of the balance if the PBM business significantly declined, to reflect that the asset was impaired.  Defendants Park, Griffin, and Kavthekar would have reviewed the goodwill balance each quarter when certifying the accuracy of the Company's filed financial statements.

46.     In conference calls accompanying the announcements of the NPS and LDI acquisitions, Hagerman emphasized three keys to success in Diplomat's expansion into the PBM business: (1) provide exceptional service to compete in the small- and mid-size payer market; (2) retain the PBM customers, and key legacy employees, so Diplomat could cross sell its specialty

---

[4]     Goodwill in an acquisition represents the amount by which the purchase price exceeds the fair value of the acquired business's net assets.  Goodwill is considered to be an asset for the acquiring company because future economic benefits are expected.  In other words, the acquiring company is paying a premium to gain the benefit of future performance.  Under accounting rules, the Company must test goodwill for impairment at least annually, and if the goodwill is deemed to be impaired, a charge must be recorded.

- 14 -

pharmacy services; and (3) utilize NPS's highly-valuable proprietary claims processing system to provide the PBM business's customizable services.

47.     Hagerman and the Company provided further context for each of these keys to success.  For example, regarding the importance of service, on November 6, 2017, Hagerman said:

> [W]e're not looking to go after the biggest[,] largest clients in the country.  There's a huge amount of need in that small to midsize client base, that zero to 100,000 to 200,000 lives, and a little smaller, a little larger, where they're not necessarily the largest client in the world for the Big 3, but they've got needs and they want customized service.

On November 8, 2017, Hagerman explained that the customers (payers) in this market were "looking for unique, customized clinical services," and "[t]hat's exactly what NPS brings."  On November 15, 2017, Hagerman added:

> [S]mall employer groups and things, they really want services.  And if you look across the overall mix of our clients between NPS and LDI, you'll see that our average client is a little over 1,000 lives. . . . And these smaller populations really need customized services. And those customized services are really beneficial for us.

48.     Hagerman also stressed the benefits of retaining key employees so they could retain the NPS and LDI customers to allow cross-selling and offering of bundled services.  For example, on November 6, 2017, Hagerman noted that Diplomat would focus on "find[ing] PBM opportunities where [it] can bring specialty infusion and specialty pharmacy services" to those clients.  On November 8, 2017, Hagerman added that Diplomat could begin cross-selling its specialty pharmacy services to NPS's 475,000 lives because "NPS . . . did not own their own specialty pharmacy . . . [so] none of [the 475,000 lives were] getting their drugs through NPS Specialty Pharmacy because there wasn't one.  Well, the minute we close, there will be one.  It will be Diplomat.  And so we will have the ability to immediately pick up the lives of that organization."  On November 15, 2017, Hagerman further explained that "this can be a very solid book of business for us because we can offer services across a number of areas" which "can create revenue as we save these self-funded

- 15 -

employers money by supplying a long host of services for them" and noting "[i]t's a fairly lucrative marketplace, and that's why the focus has been on this area."

49. To retain the legacy PBM customers and provide the cross-selling opportunities, an investor slide presentation accompanying the January 8, 2018 conference call made clear that the NPS "[s]enior management team will remain in place." And Hagerman repeated this on November 15, 2017, stating that:

> [T]he resources that NPS brings on board, very, very strong leadership and management at NPS that will come onboard as executive leaders across the larger operation and the significant talent that the LDI overall leadership brings, puts us in position right now to really go out and again have everything we need for the market.

Similarly, when asked about potential cost savings from integrating sales forces, Hagerman responded that savings from the merger would come from areas other than reducing payroll and Saban said, "we have the opportunity to take both sales forces, take the best learnings and techniques from each and apply it to a wider variety of opportunities."

50. Finally, Hagerman touted NPS's proprietary claims processing system as a major benefit from the NPS acquisition and critical to Diplomat's customizable PBM offerings. For example, on November 6, 2017, Hagerman said acquiring NPS's "proprietary claims processing system gives us scalable opportunities for future growth," and noted that NPS had "a very broad platform and they have their own technology internally, and that gives them very strong clinical capabilities. So we see our opportunity at Diplomat to become an accelerator for them." Two days later, Hagerman elaborated on "the importance of owning a claims processing software as the first step for Diplomat in the PBM space" because:

> [W]hat's really important is, over time and looking for that future synergy that we will expect, is having your own[] claims processing engine has some magic to it because every time you bring on a new client, every time you look at another opportunity to make an acquisition or do a tuck-in, you immediately save money because you're managing your own claims. We no longer have to pay claims processing fees to outsiders.

- 16 -

And, on November 15, 2017, Hagerman explained that "one of the reasons that NPS was our first acquisition" was its "very, very robust transaction claims processing engine." Saban added: "With us having our own technology platform, we're looking to bring unique programs to our clients, specifically revolving around the management of specialty medications. . . . So we believe that our specialty assets put together with the technology will be able to bring a unique offering."

**During the Class Period, Defendants Terminated Legacy PBM Management and Discarded NPS's Claims Processing Software, Leading to Poor Service and Client Losses**

51.     With Hagerman out as CEO in January 2018, defendants abandoned Hagerman's three keys to success in the PBM business which had an immediate and negative impact on client retention and profitability.

52.     As analysts eventually reported, the "legacy NPS management team, which had strong customer relationships" was not "retained post-merger." According to LinkedIn profiles, each of NPS's CEO, President, and Vice President of Network and Claims Operations stopped working at NPS (which, combined with LDI, was renamed CastiaRx after the acquisitions) in or around February 2018.

53.     Similarly, rather than leverage NPS's proprietary claims processing system to provide customizable services and save third-party fees, defendants moved NPS customers to the third-party system used by LDI, "RxClaim." This resulted in migration failures that, combined with the loss of relationships from terminating key NPS employees, led to massive customer complaints and defections. As those customers left, not only did revenues and profitability suffer, but the cross-selling opportunities that were touted as a reason for the $647 million acquisitions also vanished.

54.     The termination of key employees and migration away from the NPS proprietary claims processing system combined to negatively impact service levels and Diplomat's customer service reputation even though the entire purpose of acquiring the PBMs was to compete on service.

The short-term benefits from staffing cuts had an immediate and negative impact on service. For example, a complaint filed with the Better Business Bureau on March 27, 2018, states that a patient called CastiaRx's mail order pharmacy (part of the PBM business acquired from LDI) "multiple times and received no response." When the patient "was finally able speak to a representative, they sent my prescriptions to my local pharmacy, but failed to give me sufficient information to manage my mail order account. . . . I have left multiple requests for someone to return my call but have not received any response."

55.     As further example, a May 1, 2018 Better Business Bureau complaint says: "Within the last 6 months," *i.e.*, since the acquisition in November 2017:

> [T]he service has changed there drastically. . . . I call daily to make sure [my prescription] will be shipped and they always assure me yes, but it never happens. My doctor is almost monthly having to call me in a . . . script to the local pharmacy just so I don't run out of my meds. This is a serious matter. They are playing with people's health.

Another complaint filed on July 2, 2018 states, "the issues [are] with the pharmacy, customer service and delivery. Every month I have to spend countless hours on the phone with this company to just get my routine prescriptions."

56.     At the end of the Class Period, defendants admitted that customers were complaining and Diplomat was losing customers during the Class Period which led to lost contracts, lower revenues and lower profitability, and PBM revenues being cut in half, all of which caused defendants to admit Diplomat might not be able to remain in business.

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

57.     Throughout the Class Period, defendants made false and misleading statements regarding: (1) integration and clients; and (2) internal controls over financial reporting. These false and misleading statements portrayed Diplomat's entry into the PBM market as an unmitigated success that was succeeding in providing the cross-selling opportunities to the PBM customers who

- 18 -

were purportedly pleased with the service, transition, and new offerings. They also portrayed the integration of the PBM business to be a success from a financial controls perspective. In truth, however, the failure to retain key employees and the decision to discard NPS's proprietary claims software was causing massive service disruptions, customer complaints, defections, and negatively impacting profitability and revenues, and the failure to integrate the accounting systems led to unreliable financial reports within the organization.

**February and May 2018 False and Misleading Statements Regarding Integration and Clients**

58. The Class Period begins on <u>February 26, 2018</u>, approximately three months after the PBM acquisitions, when Diplomat issued a release announcing 4Q17 and full year 2017 financial results. That same day, defendants Park, Kavthekar, and Saban held a conference call to discuss the results. In response to an analyst question about the growth Diplomat was modeling for the PBM business, Kavthekar said they were expecting "double digit growth in that part of the business," *i.e.*, at least 10% growth over the prior $800 million in annual revenues. In addition to this rosy outlook, defendants made the following statements:

(a)     Regarding the acquisitions of NPS and LDI, Park said:

***Our integration is off to a strong start***. We have a team of executives, who have been part of the majority of PBM acquisition transactions over the past 2 decades. Acquisition integration is a core competency for us and we are following a vital tested program. ***We are executing our integration with a few key priorities in mind. First, our guiding principle is to make the process as seamless as possible for our members and clients. Second, we are applying best practices to drive a consistent and superior operating process. And third, we have brought to market our suite of specialty pharmacy and infusion services to our new small and middle market PBM clients. This is being well received in our initial discussions with clients and consultants***, who are looking for alternatives to the established models.

Entering the PBM market is critical to our growth strategy and a perfect complement to our specialty business.

- 19 -

(b)     Kavthekar, also addressing the PBM integration, added, "*I continue to be quite pleased with the progress our new leaders and various teams have made* in a relatively short period of time.  Not only have they been impactful around our cost of goods, but also *in building stronger relationships with our clients*."

(c)     Saban likewise stated during the call:

> *We've had some early discussions with our clients* and industry consultants *and they've been very positive.  In the small and middle market, no one has our clinical and specialty services strength.  This is what differentiates us*.  In short, we are excited to bring a clinically strong specialty-centric PBM to the middle market.  We feel this is a huge game changer.

(d)     When an analyst asked Park, "why did you acquire both LDI and NPS," rather than just one, he responded: "*When you look at what we see in NPS and with LDI, individually, they're unique in the relationships they have with their clients, both have long durable relationships with their customers.  That is a huge value proposition*, both – the big part of the value for each of those companies."

59.     On May 7, 2018, Diplomat issued a release announcing 1Q18 results.  The release quoted Park as saying:

> *Our first quarter demonstrated strong performance in* both our Specialty segment and *our PBM segment* – relaunched last week under its new brand, CastiaRx.  *Our PBM integration has progressed rapidly, and as our innovation, growth and profitability initiatives continue to gain momentum*, we believe we can drive substantial market share gains over time and generate long term value for all our stakeholders.

Diplomat increased its 2018 revenue guidance from $5.3 – $5.6 billion to $5.5 – $5.9 billion and reiterated its EBITDA guidance of $164 – $170 million.

60.     The next day, May 8, 2018, Park, Kavthekar, and Saban held a conference call to discuss the 1Q18 results and made the following statements:

(a)     Park stated:

- 20 -

*Our PBM integration is well underway, and we delivered $1 million in synergies*, offset in the quarter by cost to achieve these synergies. *This is a great start, delivering already an annualized synergy of $4 million compared to the $4 million to $6 million in synergies we outlined for the full year 2018.* We successfully rebranded and just launched our new PBM name, CastiaRx. CastiaRx represents a unique PBM offering for the small and midsized payers.

 (b) Saban added:

*I would also like to quickly add to [Park]'s comments on the PBM integration. We're off to a very strong start, ensuring our patient and client experiences are strong* and bring to bear the full complement of cost, specialty, clinical and technology solutions to all of our 600,000-plus members. *I would personally like to recognize the Diplomat and CastiaRx teams for their hard work and dedication to high customer service and operational excellence*.

 (c) Kavthekar added:

*We are definitely pleased with the progress made and certainly excited about the early reception to CastiaRx's new branding and go-to-market strategy. . . . [we] now expect the PBM's top line* to have a contour that is relatively flat for Q2, and *slightly lower in Q3 and Q4 as a few small and low-margin clients exit the legacy [NPS] business*. Adjusted EBITDA in the quarter was strong and in line with our expectations of $40 million. *With our continued investment in people and systems, this forms a solid foundation for our 2018 outlook*.

 (d) Responding to an analyst question about the PBM business, Park emphasized that "*the small and midsized clients are not getting the service levels they deserve* nor the focus on specialty costs and patient management."

 (e) Park later added:

*Our focus since the integration began in January, was to work with our clients and their patient populations to identify which ones would be best served from a service and price perspective*, with our specialty pharmacy distribution capability. *And we've already been able to drive some good progress in that. With the brand launch of CastiaRx and really the focus of bringing the specialty offering into that small to medium market, we expect to continue to drive that here in the second and third quarter*.

 (f) Kavthekar likewise emphasized "the makeup of the PBM business . . . caters to a different part of the market," where Diplomat can drive profits because "*there's a broad set of services that bring – that we bring to bear in the marketplace*."

61.     Analysts reacted positively to the statements.  For example, on February 27, 2018, analysts from JPMorgan raised their stock price target for Diplomat, citing "the integration of the two acquired PBM businesses is off to a strong start" as a "key takeaway" from the earnings call. On March 2, 2018, analysts from Deutsche Bank similarly increased their rating for Diplomat to "Buy," noting Diplomat was "emerging as one of the leaders and more differentiated PBMs in th[e] middle-market category."

62.     On May 8, 2018, analysts from Leerink increased their price target and reported, "Bottom Line: On the call this morning management outlined the early success in the integration of the PBM business."  The analysts added that the PBM segment "is targeting small and mid-sized payers and early discussions with brokers and PBM consultants have 'been very positive.'"  Analysts from William Blair similarly maintained their "Outperform" rating for Diplomat on May 8, 2018, noting "we were reassured by the integration progress, stability of operations, and reported favorable reception from benefit consultants."  And on May 10, 2018, analysts from JPMorgan increased their rating for Diplomat stock from "Neutral" to "Overweight" (meaning it was a better value), pointing to the opportunities for "cross-selling specialty pharmacy into the LDI and NPS customers as well as opportunities to drive new PBM business wins."

63.     The statements in ¶¶58-60 above were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants, were:

        (a)     Despite defendants claiming that the PBM integration was off to a "strong start," had "progressed rapidly," and that the Company was "executing" on making the integration a "seamless" client experience and "ensuring our patient and client experiences are strong," defendants had made little progress on the PBM integration; Diplomat was still months away from integrating PBM customers onto a single software platform; and Diplomat could not provide industry standard

- 22 -

PBM services, which was negatively impacting service levels and Diplomat's reputation among customers.

(b)     Defendants' statements that they were "quite pleased with the progress our new leaders and various teams have made" in "building stronger relationships with our clients," that NPS and LDI were "unique in their relationships they have with their clients," and praising the employees' "dedication to high customer service and operational excellence" were misleading because they omitted to disclose that Diplomat was pursuing short-term cost savings at the expense of long-term profitability by failing to retain sufficient sales staff and failing to retain key employees from the acquired PBMs who developed the client relationships; and as a result service levels were declining, customers were complaining, and Diplomat's reputation was suffering, which impeded its efforts at cross-selling.

(c)     Defendants' statements claiming "$1 million in synergies" and "already an annualized synergy of $4 million" were misleading because the short-term and modest cost savings were being incurred at the expense of long-term revenues worth tens of millions of dollars, as Diplomat had terminated key legacy PBM employees and failed to retain a sufficient sales force, which was negatively impacting client relationships and service levels.

(d)     Despite defendants touting cross-selling opportunities with the PBM clients by claiming that "specialty pharmacy and infusion services" were being "well received" by clients and that client discussions had "been very positive," that "growth and profitability initiatives continue to gain momentum," and that they had made "good progress" in identifying clients in the PBM space for their "specialty offering," defendants omitted to disclose that they had terminated key legacy PBM employees and they were receiving numerous customer complaints, leading to customer losses, which was expected to negatively impact customer retention and the ability to cross-sell specialty pharmacy services to the PBM customers.

- 23 -

(e)  Defendants' claim that they lost "a few small and low-margin clients" was misleading because it omitted to disclose the wide-ranging impact that the key employee departures and service failures were having, which would not only reduce PBM revenues but also undermine the cross-selling opportunities that were used to justify the $647 million PBM acquisitions.

(f)  Defendants' disclosure of the loss of "a few small and low-margin clients" was also misleading because they omitted to disclose that roughly 25% of the PBM business had already been bid by the legacy PBMs (prior to Diplomat's acquisition) at prices that were no longer competitive and which were likely to lead to significant customer losses.

**August 2018 False and Misleading Statements Regarding Integration and Clients**

64.  On August 6, 2018, Diplomat issued a release announcing 2Q18 results.  The release quoted Griffin as saying: "***The Diplomat team delivered another great quarter with record revenue and adjusted EBITDA, driven by continued solid execution of our plan.  Our PBM integration is reaching its conclusion with CastiaRx demonstrating strong results in the quarter***, *as well as continued momentum on our growth and profitability initiatives* across the entire enterprise."[5]

65.  That same day, August 6, 2018, Griffin, Kavthekar, and Saban held a conference call to discuss the 2Q18 results and made the following statements:

(a)  In his opening remarks, Griffin stated: "***Our results were driven by strong execution of the CastiaRx integration of the NPS and LDI, PBM businesses, and their outperformance against expected synergies***."

(b)  Griffin added that the "***[s]ynergies are being driven by improvements on contracts [and] PBM services***."

(c)  Kavthekar similarly highlighted:

---

[5]  Defendant Park ceased serving as the Interim CEO in May 2018.  On June 4, 2018, defendant Griffin was appointed as Diplomat's CEO and Chairman of the Board.

- 24 -

> *[W]e generated $2 million of incremental synergies for a total of $3 million recorded in the second quarter*.  Combined with the synergies called out during our Q1 call, *we are now exceeding our initial synergy estimate* and now expect [a] total of $8 million to $10 million in synergies in 2018.

> *We continue to be quite pleased with our PBM results* as they demonstrate the *tremendous progress the team has made in the integration process*.

      (d)      Discussing existing and prospective PBM customers, Griffin said:

> *Feedback from consultants, clients and prospective clients since the launch of CastiaRx has been positive, and interest in the CastiaRx offering is quite high*.  We are in the middle of the busiest part of the 2019 selling season.  *Proposal volume continues to grow at a steady pace*, and we expect above average proposal value to continue for the next 2 to 3 months.

> *Proposal volume for the month of July was approximately double what we saw a year ago.  In the small- to middle-market, no one has our clinical and specialty services strength.  That is what differentiates us*.

      (e)      Griffin reemphasized that Diplomat's superior service in the PBM business set it apart from competitors, saying: "*Our investments* directly improve patient adherence, operational efficiency and *underscore our commitment to superior service*."

      (f)      Griffin further reiterated that "*[a]lthough we offer and deliver all the services of the PBM, it is our specialty expertise and our unique set of services that sets us apart and are gaining traction*."

      (g)      When asked about "what has been sort of surprising thus far in the integration process," Kavthekar emphasized that CastiaRx was "*improving the base contracts, the legacy contracts we inherited*" and providing "*a set of services around other services to clients that are going to be driving some of that [additional synergies]*, manufacturer discounts is part of it, and *just a general improvement in the cost of sales*."

      (h)      When asked about "PBM selling season and how it's progressing," Griffin responded that:

*[T]he integration at – within CastiaRx is going really, really well*. In terms of the selling season, ironically, I've got a number of my former Medco sales and account management folks managing that for us here at CastiaRx, but that – *the RFP volume has increased dramatically*. . . . *[W]ithin the middle market we're seeing an increase in volume*. And I think relative to July of last year, *we're seeing roughly double the RFP volume that we saw last year. So excited about the opportunities that, that will bring*.

       (i)      Saban added in response to the same question:

Yes, as indicated by [Griffin], *we continue to have a large increase in our RFP request*. . . . The selling season is – right now, *we're currently in finalist meetings*. We're currently talking to various constituents out in the marketplace, and they will be making decisions here at the end of third quarter, even at the beginning of the fourth quarter as these clients tend to make these final decisions at that part of the year. *So we're extremely pleased with not only the activity of the RFPs, but also with the actual conversations that we're having with the plans*. It's really hard to tell right now any activity from the upcoming PBM acquisitions by the health plan or the health plan being acquired by PBMs. And – but for us, *we're extremely pleased with not only as I said the RFP activity, but also with the response that we've been getting from the consultants and the clients that we presented to*.

       (j)      Regarding 2018 guidance, Kavthekar stated: "We are making no changes at this time to our revenue guidance of $5.5 billion to $5.9 billion, but do note that *we are expecting a slight decrease in PBM revenues in the second half as certain legacy, low-margin contracts are exited*, consistent with our comments on our first quarter call."

      66.      Analysts were again encouraged by the positive statements. For example, on August 7, 2018, analysts from William Blair stated that defendants' "discussion of the new PBM strategy was reassuring. The integration and synergy capture process is ahead of schedule, client interest in the specialty-oriented PBM offering is reportedly high, and management noted that selling season requests for proposal volume is running double year-ago levels." On August 9, 2018, analysts from JPMorgan reiterated their positive rating for Diplomat stock, saying:

PBM selling season is going well. The company noted that feedback from consultants, clients and prospective clients has been positive and that the interest level has been high. RFP volume is growing at a steady pace, with proposal volume in the month of July about double the amount in the prior-year period. Management

- 26 -

believes that clinical and specialty services strength is what differentiates the company in the small/middle market.

67.     The statements in ¶¶64-65 above were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)     Despite defendants touting the "strong execution" of the PBM integration and claiming it was "reaching its conclusion" and "going really, really well," defendants' migration of NPS customers onto LDI's third-party claims processing system was resulting in service failures and customer complaints, leading to customer losses; Diplomat was still months away from completing the integration of PBM customers onto a single software platform; and Diplomat could not provide industry standard PBM services, which was negatively impacting service levels and Diplomat's reputation among customers.

(b)     Defendants' statements claiming an "outperformance against expected synergies" and the generation of "$2 million of incremental synergies" that were "exceeding our initial synergy estimate" were misleading because the short-term and modest cost savings were being incurred at the expense of long-term revenues worth tens of millions of dollars, as Diplomat had terminated key legacy PBM employees and failed to retain a sufficient sales force, which was negatively impacting client relationships and service levels.

(c)     Despite defendants' statements that client feedback "has been positive," that they were "extremely pleased . . . with the actual conversations that we're having with the plans," *i.e.*, clients, that client "interest in the CastiaRx offering is quite high," that "no one has our clinical and specialty services strength," and that "our unique set of services . . . sets us apart and are gaining traction," defendants omitted to disclose that they had terminated key legacy PBM employees, the migration of NPS customers onto LDI's claims processing system was resulting in service failures, and they were receiving numerous customer complaints, leading to customer losses, which was

- 27 -

expected to negatively impact customer retention and the ability to cross-sell specialty pharmacy services to the PBM customers.

(d)     Defendants' claims that they were "improving the base contracts, the legacy contracts we inherited" and that Diplomat would be losing "certain legacy, low-margin contracts" were misleading because they omitted to disclose that roughly 25% of the PBM business had already been bid by the legacy PBMs (prior to Diplomat's acquisition) at prices that were no longer competitive and which were likely to lead to significant customer losses.

**September 2018 False and Misleading Statements Regarding Integration and Clients**

68.     On September 5, 2018, defendant Kavthekar participated in an analyst conference on behalf of Diplomat and reiterated that Diplomat was maintaining its $5.5 – $5.9 billion revenue guidance and also made the following statements:

(a)     In response to an analyst comment that the PBM integration "sounds like it has gone very well" and request for additional information regarding the integration, Kavthekar said:

> Yes, I think **hats off to the team that managed that integration**, or I should say is managing that integration. I don't think we can declare that it's completed yet, but it is **definitely approaching its last innings of the game. I think we are quite pleased and we hadn't expected it would be anything other than successful**. I think we have been quite pleased at its progress.

(b)     An analyst, referencing "a couple of larger but very low margin accounts that are winding down," asked whether expected revenue declines would mean a "3%, 5%, 7% kind of decrease," and Kavthekar responded: "***Yes . . . . That is [the] magnitude that we are talking about. We are not talking about anything overly meaningful other than in the small single-digit type of percent***."

69.     On September 12, 2018, defendants Griffin, Kavthekar, and Saban participated in an analyst conference on behalf of Diplomat and made the following statements:

- 28 -

(a)　　　Regarding the PBM integration, Griffin emphasized that "*we've been very busily focused on the integration of what was the legacy LDI business and NPS PBMs and that has been going very well. So the integration process I think has been managed extremely well*."

(b)　　　When an analyst asked about the "cross-selling opportunity between the PBM, the existing clients that you have in the specialty business, . . . [s]hould we think it is simplistically as contracts, or 3-year contracts and every year, you're just going to convert the PBM clients," Griffin responded:

> So relative to the core PBM, yes, *I think you're looking at it the right way*. It's – it is within our small group marketplace. It's typically 3-year contract terms. *And specifically, the specialty opportunity within that, I think as part of the integration process, the team has done a really nice job, not only executing on the integration. So we're – basically, we're taking 2 legacy PBMs and we're putting them on to a single platform and that's been going extremely well*.

(c)　　　Later in the call, Griffin claimed that the PBM integration was not only a success, but also an asset to the Company, saying: "*[W]e just talked about the integration of the legacy PBMs, I think they've executed very well*. And unlike a lot of other organizations, I think I've seen in health care, *they've actually integrated the business onto their platform, which I think is a significant operating advantage*."

(d)　　　When asked about Diplomat's win rate in RFPs and progress in the "selling season," Griffin claimed "during the earnings call, I think we actually pointed [out] *the fact that RFP volume activity is up double relative to the legacy businesses*. So we don't know yet how that translates into win rates."

(e)　　　Griffin also stated:

> [A]s *we think about the legacy businesses*, it's – we really are a commercially focused small group player. *And obviously, we've been able to drive significant growth in that area*. We're going to continue to be focused in that area. *The operating platform that we use to support that business is I'd argue the best in the industry*. So it's very scalable. So that market opportunity that I referenced earlier, that $100 billion dollar market opportunity in small group, we can – *with our*

- 29 -

***existing platform, without further investment, in other words, we can scale into that market and grow it***. So our focus will continue to be to grow that commercial marketplace.

70.    Defendants' positive statements about the integration and clients continued to reassure investors. For example, on October 8, 2018, analysts from Lake Street Capital Markets maintained their "Buy" rating and price target of nearly double Diplomat's trading price, noting management had claimed the "integration of last year[']s 2 PBM acquisitions continues to go very well," and stating that the PBM acquisitions "strengthen the company and create an opportunity for outperformance."

71.    The statements in ¶¶68-69 above were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)    Despite defendants claiming that the PBM integration was "approaching its last innings," and that the integration had "been managed extremely well" and was "going very well," defendants' migration of NPS customers onto LDI's third-party claims processing system was resulting in service failures and customer complaints, leading to customer losses; Diplomat was still months away from completing the integration of PBM customers onto a single software platform; and Diplomat could not provide industry standard PBM services, which was negatively impacting service levels and Diplomat's reputation among customers.

(b)    Defendants' assurances that any PBM revenue decline from the "larger but very low margin accounts" was not going to be "anything overly meaningful other than in the small single-digit type of percent" were misleading because they omitted to disclose that the losses were roughly 25% of the PBM business that had already been bid by the legacy PBMs (prior to Diplomat's acquisition) at prices that were no longer competitive.

(c)    Defendants' statements that the "team has done a really nice job" executing on cross-selling opportunities, and that they have been "able to drive significant growth" in the "legacy

- 30 -

business" were misleading because they omitted to disclose that Diplomat was pursuing short-term cost savings at the expense of long-term profitability by failing to retain sufficient sales staff, failing to retain key employees from the acquired PBMs who developed the client relationships, and as a result service levels were declining, customers were complaining, and Diplomat's reputation was suffering which impeded its efforts at cross-selling.

(d)     Defendants' statements that "we're taking 2 legacy PBMs and we're putting them on to a single platform and that's been going extremely well," that putting the PBM business on a single platform "is a significant operating advantage," and that "our existing platform, without further investment" could help "grow" the market were misleading because they omitted to disclose that defendants' migration of NPS customers onto LDI's third-party claims processing system was resulting in service failures and customer complaints, leading to customer losses; Diplomat was still months away from completing the integration of PBM customers onto a single software platform; and Diplomat's failures in integrating PBM customers onto a single platform were negatively impacting Diplomat's reputation among customers.

**November 2018 False and Misleading Statements Regarding Integration and Clients**

72.     On <u>November 6, 2018</u>, Diplomat issued a release announcing 3Q18 results.  The release quoted Griffin as saying: "***Results were driven by strong*** Specialty segment growth and ***PBM performance***."

73.     That same day, <u>November 6, 2018</u>, Griffin, Kavthekar, and Saban held a conference call to discuss the 3Q18 results.  Defendants admitted to losing $200 million worth of legacy PBM contracts (*see* ¶79), but made the following statements:

(a)     Regarding the PBM integration, Griffin said: "***We continue to be pleased with the CastiaRx performance***" and "***we have been very successful in the integration***."

- 31 -

(b)      Kavthekar similarly emphasized that defendants "***remain pleased with CastiaRx's performance through the closing of the integration progress***."

(c)      Discussing synergies from the PBM integration, Griffin emphasized that "***[s]ynergies remained at a run rate similar to 2Q '18, for a year-to-date total of $7 million***, tracking in line with our guidance of $8 million to $10 million in synergies in 2018."

(d)      Turning to the PBM "selling season," Griffin said: "***We continue to see strong interest in CastiaRx's solutions since we launched the brand on April 30, observing significantly higher RFP activity compared to last year***. We believe that our value proposition is resonating in the market as ***we've been awarded new client contracts in the third quarter***."

(e)      Kavthekar added that defendants were "***seeing strong interest in CastiaRx's solutions, and we are seeing some early new client wins***. At the same time, ***we are also renewing clients at current market rates***."

(f)      In response to an analyst question on the PBM business, Griffin responded: "***[W]e're seeing a lot more RFP activity, certainly, relative to last year***. So we're expecting that we'll be in the hunt, so to speak, on a significant amount of new name business in '19. . . . I think that ***we're getting a nice uptick and interest in the brand***."

(g)      Regarding the lost PBM business, an analyst asked, "it seems to be about 1/4 of the PBM business. Can you just give us a little bit more color on the relationship and why did you lose the contract? And do you think this is a one-off? If there's some kind of like structural issue behind that?" Griffin responded:

> But so these – this, by the way, was multiple Med D contracts, so it wasn't just 1. And these were contracts that were bid by the legacy companies prior to Diplomat's acquisition of those businesses. So as you know, in terms of the Med D bidding cycle, you're really – you're bidding 15, 18 months in advance of the Medicare contract effective date. So in these – ***the 2 clients that we're referring to earlier were bid out in advance of Diplomat's ownership***, and importantly, in advance of being able to leverage Diplomat's cost of goods and our pricing position. ***So I do***

- 32 -

***think that is a one-off***.  Obviously, we're disappointed that we lost that business.
***However, on a move forward basis***, again, we believe that based on our new cost of
goods position that we've been able to negotiate with pharma as well as network
contracting, et cetera, I think, as evidenced by the Castia performance in 2018 here,
that ***we're very well-positioned to win, again, both in commercial and Med D into
the future.  So I would look at them as a one-off***.

(h)     During the call, two separate analysts asked about Diplomat's PBM client
"retention rates," and Griffin responded: "***So I don't have, at this sense, a year-over-year
comparison against client retention rates***" and "***we really don't have full visibility into client
retention level at this point***."

(i)     Responding to the same question, Saban said: "***[W]e feel very confident that
we – that our retention rate is typical, if not a little bit better than most PBMs***, but this client base
does have some fluctuation based on membership within the clients themselves."

74.     The statements in ¶¶72-73 above were materially false and misleading when made.
The true facts, which were then known to or recklessly disregarded by defendants, were:

(a)     Despite defendants claiming that they had "been very successful in the
integration" and "remain pleased" with integration, defendants' migration of NPS customers onto
LDI's third-party claims processing system was resulting in service failures and customer
complaints, leading to customer losses; Diplomat was still months away from completing the
integration of PBM customers onto a single software platform; and Diplomat could not provide
industry standard PBM services, which was negatively impacting service levels and Diplomat's
reputation among customers.

(b)     Defendants' statement claiming a "year-to-date total of $7 million" in
synergies was misleading because it omitted to disclose that Diplomat was pursuing short-term cost
savings at the expense of long-term profitability by failing to retain sufficient sales staff, failing to
retain key employees from the acquired PBMs who developed the client relationships, and as a result

- 33 -

service levels were declining, customers were complaining, and Diplomat's reputation was suffering which impeded its efforts at cross-selling.

(c)     Defendants' statements that PBM losses were a "one-off," that they saw "strong interest in CastiaRx's solutions," and that they were "seeing some early new client wins" and "renewing clients at current market rates" were misleading because they omitted to disclose the integration service failures and that Diplomat was pursuing short-term cost savings at the expense of long-term profitability by failing to retain sufficient sales staff, failing to retain key employees from the acquired PBMs who developed the client relationships, and as a result service levels were declining, customers were complaining, and Diplomat's reputation was suffering which impeded its efforts at cross-selling.

(d)     Defendants' claim that they did not have "full visibility" into retention rates but were "very confident that we – that our retention rate is typical, if not a little bit better than most PBMs" was misleading because it omitted to disclose the wide ranging customer complaints due to the service failures and failure to retain key employees with strong customer relationships.

**Class Period False and Misleading Statements Regarding Internal Controls**

75.     On May 8, 2018, Diplomat filed its quarterly report on Form 10-Q for 1Q18 (the "1Q18 10-Q").  The 1Q18 10-Q was signed by defendant Kavthekar and contained the following false and misleading statements:

(a)     The 1Q18 10-Q assured investors that the Company's internal controls over financial reporting were effective and free from material weaknesses, stating, "*[t]here were no changes in our internal control over financial reporting . . . that occurred during the first quarter of 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*," (the "Internal Controls Statement").

- 34 -

(b)    The 1Q18 10-Q also included signed certifications, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), by defendants Park and Kavthekar vouching for the effectiveness of the Company's internal controls, stating that Park and Kavthekar were the ones responsible for establishing and maintaining effective disclosure controls and internal controls over financial reporting and that they:

> *[H]ave disclosed, based on [their] most recent evaluation of internal control over financial reporting*, to the Company's auditors and the audit committee of the Company's board of directors . . . .
>
> *a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information*.

76.    On August 7, 2018, Diplomat filed its quarterly report on Form 10-Q for 2Q18 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by defendant Kavthekar and contained essentially the same *Internal Controls Statement* as set forth above (¶75(a)) and included essentially the same *SOX Certifications* as set forth above (¶75(b)) signed by defendants Griffin and Kavthekar.

77.    On November 7, 2018, Diplomat filed its quarterly report on Form 10-Q for 3Q18 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by defendant Kavthekar and contained essentially the same *Internal Controls Statement* as set forth above (¶75(a)) and included essentially the same *SOX Certifications* as set forth above (¶75(b)) signed by defendants Griffin and Kavthekar.

78.    The statements in ¶¶75-77 above were materially false and misleading when made because they omitted to disclose that the Company's internal controls over financial reporting were not effective, the Company failed to establish adequate internal controls over financial reporting with respect to the acquired PBM businesses, and the Company was suffering from material weaknesses in its internal controls.

## THE TRUTH IS REVEALED

79.     Starting in November 2018, and continuing through a series of disclosures, defendants revealed that the PBM integration was causing massive losses;  the failure to retain key PBM employees and transition from NPS's proprietary claims software was leading to service failures and repeated customer complaints and loss of business; rather than growing the PBM business and providing cross-selling opportunities, and Diplomat was losing half the legacy PBM business, all of which caused massive financial harm leading the Company to disclose after over 40 years in business that it needed to be acquired or could be forced into bankruptcy.

### November 2018 Disclosures

80.     After market close on <u>November 6, 2018</u>, Diplomat admitted the loss of PBM customers accounting for 25% of PBM revenues ($200 million).  Defendants mitigated the impact of the disclosure by making false and misleading statements that the losses were due to "one-off" issues.  Diplomat also reported that 3Q18 PBM revenues had declined by 10% from the prior quarter (from $189 million in 2Q18 to $170 million in 3Q18) and reduced its 2018 revenue guidance by $200 million as a result of, in part, "known PBM revenue losses."

81.     On this news, the price of Diplomat common stock plummeted, falling from a close of $20.34 on November 6, 2018 to a close of $14.80 on November 7, 2018, erasing more than 27% of the Company's market capitalization ($410 million) in a single day on trading volume of 7.2 million shares, nearly eight times higher than the prior day's volume.

82.     On November 7, 2018, analysts from Leerink expressed shock that the PBM integration was not as successful as defendants had represented.  The analysts slashed their price target by 14%, stating, "we are very surprised by the magnitude of the [PBM] loss," and "[w]e are concerned that, in conjunction with another quarter of weak revenue, [Diplomat] may be struggling to win new PBM business and plug the hole left by the ~25% loss of their PBM business."  In

contrast to defendants' prior statements about growth, the analysts also noted that management was now characterizing 2019 as a "'rebuilding year.'"

83.     On November 8, 2018, analysts from Barclays likewise cut their price target and attributed the Diplomat stock decline, in part, to the impact of the $200 million "additional PBM business losses for 2019." The Barclays analysts suggested that defendants may be concealing additional negative information because they refused to provide a "dollar amount of 'selling season wins and losses' that are disclosed by some other PBMs." The analysts, however, continued to see Diplomat "as a buying opportunity," believing the losses were from one-off issues rather than "head-to-head RFP losses."

**January 2019 Disclosures**

84.     On January 7, 2019, Diplomat issued a release and hosted a conference call to update 2018 guidance and provide 2019 guidance. In the release, the Company disclosed an "additional $120 million combined revenue impact from [PBM] client losses." As a result, Diplomat reduced its top-end 2018 revenue guidance by another $100 million, and issued 2019 guidance that represented a nearly 40% decline in PBM revenues from 2018.

85.     In stark contrast to defendants' optimistic Class Period statements, the release quoted defendant Griffin admitting that "'there is no question that this segment [the PBM segment] disappointed in 2018.'" Moreover, during the conference call, Griffin revealed that the cause of the PBM customer losses was not due to one-off issues as previously claimed but were "primarily the result of poor execution on client retention," which "ha[d] been a drag on the company and it's been painful." Essentially admitting that Diplomat had cut too many people and failed to retain a sufficient sales force, Griffin said Diplomat was "executing [on] a plan to expand our sales and account management teams to drive better client retention rates and to be more responsive to the unique needs of this middle market set of clients." Diplomat also announced the termination of the

- 37 -

employment of defendant Saban and the President and CEO of CastiaRx (Thigpen), "effective immediately."

86.     Analysts again reported on the disappointing revelations and on January 7, 2019, analysts at Cowen and Company reported that: "According to our discussions with [management], incremental client losses were largely due to the loss of legacy NPS clients, partly due to the loss of relationships when NPS [management] wasn't retained post-merger as well as some service issues."

87.     The same day, analysts at JPMorgan provided "quick thoughts post . . . our conversations with management."  The report stated that:

> [I]ncremental customer losses were driven by weaker renewals at the NPS business, as well as profit step downs on renewals.  We note that the company did not retain the NPS management team, and when the company went through the conversion to the [new] platform, that provided an opportunity for some customers to put their business out to bid, and the company was unable to complete some of those renewals.

88.     Analysts from Credit Suisse cut their price target by 12%, saying that the Diplomat stock "will likely decline further on the disappointing preannouncement, where a weaker expected performance in its PBM business, CastiaRx, continues to be an overhang."  Analysts from William Blair cut their stock rating for Diplomat because "the integrated PBM strategy was the key thesis behind our bullish outlook" and "we now have a much lower level of confidence that the PBM can be a growth engine for Diplomat."  And analysts from Leerink had a similar reaction, saying, "[w]e are disappointed by further client losses in [Diplomat's] PBM segment," and "the departures of [Diplomat's] President Joel Saban and CastiaRx's President and COO Albert Thigpen highlight the struggles faced by the PBM and the massive under-performance of the segment."

89.     After the revelations on January 7, 2019, the price of Diplomat common stock declined again, falling from a close of $14.10 on January 4, 2019 to a close of $12.62 on January 7, 2019, erasing more than 10% of the Company's market capitalization ($110 million) in a single

trading day on trading volume of 1.9 million shares, more than double the prior trading day's volume.

90.     On January 15, 2019, analysts at JPMorgan continued to report on the PBM losses, saying they "came mainly from the NPS side of the PBM business, where [Diplomat] did not retain the legacy NPS management team, which had strong customer relationships."

**February 2019 Disclosures**

91.     On February 22, 2019, Diplomat again surprised investors by disclosing that it could not file its 2018 Form 10-K on time, it was withdrawing its 2019 guidance (issued less than two months earlier), and it would be recording a substantial goodwill impairment charge relating to the PBM acquisitions.  Specifically, Diplomat issued a release, stating in part:

> **Diplomat Pharmacy, Inc. (NYSE: DPLO)**, announced today that it is postponing the release of its fourth quarter and full-year 2018 financial results and the related conference call and webcast to March 15, 2019.  The Company expects to file its annual report on Form 10-K for the fiscal year ended December 31, 2018 soon afterwards.
>
> The postponement is due primarily to the recent determination by Diplomat and its auditors that the company will need to record a non-cash impairment charge related to its PBM business.  This charge is expected to be equal to a significant portion of the PBM's Goodwill and Definite-lived intangible assets, which total approximately $630 million as of December 31, 2018, prior to impairment charges.  The charge relates to the 2017 acquisitions of NPS and LDI and is driven by reduced financial forecasts for the PBM business.

92.     The release further acknowledged that "[d]espite success in improving our customer service performance to industry standard levels, previously disclosed execution challenges experienced in 2018 continue to impact customer perception and have resulted in further customer losses."  The release quoted Griffin as saying: "'While we have made demonstrable operational and service improvements in our PBM business, we are still working through issues and headwinds.'"

93.     On February 22, 2019, analysts from Credit Suisse slashed their price target by 20% and reported that Diplomat "shares are falling further on the recent update, where the weakness in its

- 39 -

PBM segment is even worse than feared." Analysts from William Blair reduced their rating to "Underperform" due to the delayed 2018 Form 10-K, the withdrawal of 2019 guidance, and the fact that "further PBM client losses have been incurred despite 'improving customer service performance to industry standards'" all of which, the analysts noted, "appear to be negative." The analysts predicted that Diplomat stock would continue to "trade down significantly" on the news.

94.     Also on February 22, 2019, analysts from Cowen and Company said the Company's disclosures "led to shares declining 56%" which they expected "to remain at these levels." Regarding the ongoing PBM losses, the analysts stated that "the negative perception from low services levels in 2018 led to further customer losses in the PBM business." As a result, the Cowen and Company analysts stated they "see a long road towards growth."

95.     After the revelations on February 22, 2019, the price of Diplomat common stock plummeted, falling from a close of $13.46 on February 21, 2019 to a close of $5.87 on February 22, 2019, erasing more than 56% of the Company's market capitalization ($565 million) in a single day on trading volume of 18 million shares, more than 35 times higher than the prior day's volume.

96.     On February 24, 2019, analysts from Barclays issued a report after they "spoke with [Diplomat management] and received some additional color regarding the headwinds cited in their press release," reporting:

> On the PBM side of the business, management noted that service issues that occurred during 2018 were the reason for the contract losses. Unfortunately, while the service issues were fixed and service levels have improved, the clients that left have decided to move on due to the 2018 experience. Additionally, there is no single outsized contract that was lost, but rather there are various individual small contract losses that culminate in a seemingly large headwind for 2019. The contract losses have a spread out end date through 2019 which suggests the negative impact will spill in to 2020 as well.

97.     On February 25, 2019, analysts from Leerink slashed their price target by 75%, to just $6 per share, stating:

- 40 -

> In our view, [Diplomat's] PBM strategy, which once excited us, has failed.  With management suggesting a possible disposal of the business, significant client losses, and the departure of PBM leadership in January, we believe the challenges in the PBM business are likely insurmountable at this point and continue to warrant significant caution.

98.     On March 15, 2019, Diplomat hosted an earnings call to discuss 4Q18 results and Kavthekar reported that Diplomat had taken a $262 million goodwill impairment charge against the PBM business.  He said that the charge "was comprised of a $179 million impairment of the associated goodwill and an $83 million impairment of the intangibles."  The goodwill charge eliminated 40% of the goodwill recorded at the time of the acquisitions, representing a drastic decline in the fair value of the business in less than two years.

99.     Adding detail to the previously disclosed 2019 headwinds, Kavthekar also said that Diplomat was expecting 2019 PBM revenue of "between $300 million and $400 million," which was less than half of the annual revenue the businesses were reporting when they were acquired.  Again confirming that it was Company-specific failures, rather than industry issues, that caused the disappointing PBM results, Griffin said, "I continue to believe that what we are seeing in our PBM business is not due to market pressures."

100.     In response to a question about the PBM "claims platform," Griffin confirmed that, upon acquiring NPS and LDI, Diplomat retained LDI's legacy claims platform and "the migration that took place was the legacy NPS business transitioning over to the new LDI Rx claim platform." He added:

> I would say, in terms of the reason behind the contract losses, I'd say that there were clearly during mid to through third quarter of '18 service issues connected to that transition process that clearly had an impact on our – the 2018 losses that we sustained within the PBM business.  But I'd say we've stabilized that. . . . [I]t's now operating within industry standards.

101.     In response to a question about the PBM losses, Griffin responded:

And again, as I referenced earlier, these losses are really the result of the transition and migration of the legacy NPS business over to the LDI platform or RX claim. So this is service issues that we experienced during that transition period that we've now fixed. The incremental losses are clearly in the commercial side.

102. On March 18, 2019, Diplomat filed its belated 2018 Form 10-K. The 2018 Form 10-K confirmed that Diplomat "did not implement effective internal controls over financial reporting at two of our recently acquired PBM subsidiaries," LDI and NPS, stating:

Specifically, we did not maintain effective revenue controls to ensure:

- adequate review of initial client set up or monitoring of subsequent changes to customer contract terms;

- adequate review of revenue reconciliations and related billings;

- adequate review of rebate accruals and reconciliations;

- adequate review of performance guarantees;

- adequate review over the completeness and accuracy of reports and spreadsheets used in the operation of certain internal controls over financial reporting for revenues; and

- adequate review of user access administration and program change reviews to revenue applications.

The aggregation of these deficiencies was concluded to be a material weakness as of December 31, 2018.

103. The Company disclosed remedial steps including:

- Assessment of the management resources in various departments . . . to ensure there is the appropriate level of knowledge, experience and training as well as the appropriate reporting structure to establish and maintain adequate internal controls over financial reporting.

- Enhancement of the management review controls over revenue reconciliations, particularly the depth of review regarding reconciling revenue items.

- Enhancement of the LDI and NPS quality assurance review process over initial contract pricing setup and ongoing changes.

- Implementation of documentation procedures to evidence the management review controls and monitoring of client performance.

- 42 -

104. On August 9, 2019, Griffin claimed the Company had "turned the corner on some of the operating issues that we had during the initial migration of the 2 legacy PBMs onto one, single operating platform." Moreover, in discussing the PBM sales force, Griffin claimed Diplomat had only recently "fielded a professional, experienced sales organization that, candidly, we didn't have in the company a year ago."

**November 2019 Disclosures**

105. On <u>November 12, 2019</u>, Diplomat further revealed the financial impact of Diplomat's (undisclosed) 2018 PBM integration and customer service failures, revealing that the Company was on the brink of bankruptcy after taking another goodwill impairment charge related to the NPS and LDI acquisitions.

106. In a release, the Company reported PBM revenue of just $82 million, a more than 50% decline from the prior year, resulting in a $1.1 million loss on the quarter. The Company also reported an additional "$156 million non-cash impairment charge related to goodwill and definite-lived intangible assets associated with our PBM segment due to a lower anticipated win rate, a lower expected rate of renewals, and the reduction in rebate value in 2019, all of which have contributed to a reduced outlook for the financial performance of our PBM segment." Of the $156 million charge, $122 million was against goodwill, meaning Diplomat had written off 80% of the PBM goodwill asset. Griffin was quoted in the press release as citing the "'challenges we continue to face in our business, including the ongoing pressures on our PBM business,'" for the Company's dismal results.

107. During a conference call on November 12, 2019, Griffin said that Diplomat "continued to experience client losses," which "contributed to the need for an incremental $156 million impairment of PBM goodwill."

- 43 -

108.    As a result of the continued negative news revealing the financial impact of the failed

PBM integration and customer service, Diplomat announced that it was no longer certain it could

remain in business.  More specifically, the November 12, 2019 release stated that the Company:

> [M]ay not be able to meet the total net leverage and interest coverage ratio covenants
> in our credit agreement for the period ending December 31, 2019, which violation
> would give the lenders the right to terminate funding of our revolving line of credit,
> accelerate our debt (including amounts under our term loans), or foreclose on our
> assets.

Accordingly, in Diplomat's quarterly report on Form 10-Q for 3Q19 ("3Q19 10-Q") filed on the

same day, the Company reported that "management's assessment indicates . . . substantial doubt as

to the Company's ability to continue as a going concern."  Griffin stated that the Company is looking

for a "strategic alternative or transaction."  The 3Q19 10-Q added: "If the Company is not successful

in its plans to renegotiate the covenants in its credit agreement or execute on potential strategic

alternatives, we could not assure you of our ability to continue operations and may need to seek

protection under applicable bankruptcy or insolvency laws."

109.    On this news, Diplomat stock plummeted again, falling from a close of $6.20 on

November 11, 2019 to a close of $3.10 on November 12, 2019, erasing 50% of the Company's

market capitalization ($230 million) in a single day on trading volume of 13.4 million shares, more

than 20 times higher than the prior day's volume.

### ADDITIONAL SCIENTER ALLEGATIONS

**Defendants Controlled the Company's Messaging to the Investing Public**

110.    In their respective roles as director and Interim CEO, Chairman and CEO, CFO and

Treasurer, and President, Park, Griffin, Kavthekvar, and Saban were able to, and did, determine the

content of the various SEC filings, press releases, and other public statements pertaining to the

Company during the Class Period.

- 44 -

111.    Park and Kavthekar signed the Company's annual reports filed with the SEC, Kavthekar signed the Company's quarterly reports filed with the SEC, and Park, Griffin, and Kavthekar signed the SOX Certifications.  *See* ¶¶75-77.  Park, Griffin, Kavthekvar, and Saban attended conference calls and spoke on behalf of the Company throughout the Class Period.  *See* ¶¶58, 60, 65, 68-69, 73.  Park and Griffin were quoted in Class Period releases alleged herein to be false and misleading and Kavthekar signed the Forms 8-K that were submitted to file those releases with the SEC.  *See* ¶¶59, 64, 72.

112.    Further, Park, Griffin, Kavthekvar, and Saban participated in the drafting, preparation and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, these defendants were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

113.    During their time as senior executive officers and directors of Diplomat, Park, Griffin, Kavthekvar, and Saban were privy to confidential and proprietary information concerning Diplomat, its acquisition of NPS and LDI, the integration of those companies, and the PBM business.  Each of them also had access to internal corporate documents, conversations with corporate officers and employees, attended management and Board meetings and committees thereof, and reviewed reports and other information provided to them in connection therewith.  Because of their possession of such information, each of them knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

114.    With regard to the material weaknesses in internal controls over financial reporting, Kavthekar was appointed as Diplomat's CFO, Treasurer, Principal Financial Officer, and Principal

4823-1352-6958.v1

Accounting Officer before the PBM acquisitions to "lead Diplomat's financial operations." In announcing his hiring, the Company also noted Kavthekar's "extensive mergers and acquisitions and capital markets experience as an investment banker." Despite that extensive experience in acquiring businesses, Kavthekar failed to ensure that Diplomat established effective internal controls over the financial reporting of the newly acquired PBM businesses which led Diplomat to delay issuing its 2018 Form 10-K and to admit that it was unable to establish, for example, effective controls to ensure adequate review of client setup, changes in contract terms, or revenue reconciliations and billings.

**Defendants Were Responsible for and Closely Monitored the Failed PBM Integration**

115.     Defendants Park, Griffin, and Saban were hired by Diplomat specifically to integrate, launch, and run the PBM business. Upon recognizing that Diplomat would need to expand into the PBM space in order to compete in an evolving market, Diplomat appointed Park as a director in June 2017 and appointed Saban as President in August 2017. Park and Saban had spent decades running some of the largest PBMs in the country, including OptumRx, Catamaran, and CVS Caremark. *See* ¶43. In January 2018, Hagerman – who had no PBM executive experience – retired, allowing Park (appointed as Interim CEO) and Saban to implement and execute the PBM strategy. As Park emphasized on February 26, 2018, the Diplomat executive team "ha[d] been part of the majority of PBM acquisition transactions over the past 2 decades," such that "[a]cquisition integration is a core competency for us."

116.     Diplomat paid $647 million in combined consideration to acquire NPS and LDI, making it Diplomat's largest transaction ever. It was also the most important. The PBM acquisitions represented a change in business, as Diplomat had never before acquired or operated a PBM. The acquisition of NPS and LDI created an entirely new reporting segment in the Company, contributing a reported 33% of the Company's EBITDA.

- 46 -

117.    Defendants recognized, and advised the market, that the PBM business was critical to Diplomat's operations and would affect the Company's performance.  On February 26, 2018, for example, Park said "[e]ntering the PBM market is critical to our growth strategy," and Saban referred to it as "a huge game changer."  On May 8, 2018, Park further called the PBM business "a growth engine for Diplomat."  And when Griffin joined the Company, he also said, "[w]e believe this [the PBM business] is a game changer."  Analysts asked about the PBM integration and business at every conference call, and frequently addressed the topics in published reports, following the announcement of the acquisitions in November 2017.

118.    Given the size and importance of the PBM acquisitions, defendants had a duty to monitor the PBM integration, customers, and business, including lost sales and the causes thereof. Given their frequent public statements regarding these matters, it is clear that they were monitoring and had knowledge of the PBM integration, its progress, and customer reaction.

119.    Defendants' prior experience in running PBMs also supports an inference that they monitored and were aware of the critical events that were concealed from investors.  In June 2018, Diplomat appointed Griffin as Chairman and CEO.  Griffin, like Park and Saban, was brought to Diplomat for his PBM experience which included having previously served as CEO for IngenioRx, Inc., a PBM that he had built and launched for a large, nationwide payer.  Griffin also spent 25 years at Medco Health Solutions, Inc. ("Medco"), a large PBM that was acquired by Express Scripts in 2012.  In announcing his appointment as Chairman and CEO, Diplomat emphasized Griffin's experience "recently launching [a] PBM organization," his "tremendous knowledge of the PBM and specialty pharmacy industries," and his "deep understanding of the complexities and trends shaping the healthcare environment."

**Defendants' Public Statements Support a Strong Inference of Scienter**

120.     Park, Griffin, Kavthekvar, and Saban held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, the PBM integration, customers and business.  Their repeated statements to the investing public during the Class Period demonstrate knowledge of the topics on which they directly spoke, including the progress and success of the PBM integration (¶¶58(a)-(b); 60(a)-(b); 65(a), (c), (h); 68(a); 69(a)-(c); 73(a)-(b)), the synergies realized from the integration (¶¶60(a); 65(b)-(c); 73(c)), the terms and potential improvements in client contracts (¶¶65(g); 69(b); 73(g)), communications with and feedback from existing and potential customers (¶¶58(b)-(d); 60(b), (e); 65(d), (h), (i); 69(d); 72(d)-(f)), the retention and loss of PBM customers (¶¶60(c); 65(j); 68(b); 69(b); 73(g), (i)), claims processing systems (¶¶50; 69(b), (c), (e)) and the service offerings and performance of the PBM business and its sales force (¶¶49; 58(b)-(d); 60(d)-(f); 65(e)-(f); 73(d)).  Indeed, defendants addressed the PBM integration and business at every conference call during the Class Period.  In a report dated September 6, 2018, analysts from Wells Fargo noted that "[t]he questions management has been getting from investors recently are virtually all about the PBM business."

121.     Defendants were the individuals who made or approved the decision not to retain legacy PBM employees that had customer relationships and to abandon NPS's proprietary claims processing software.  For example, a June 21, 2018 report by analysts from Leerink states that the analysts "spent the day with . . . CEO Brian Griffin, President Joel Saban, and CFO Atul Kavthekar."  After emphasizing "the depth of Mr. Griffin's experience," including his "decades of experience selling and implementing PBM contracts," the analysts reported that "NPS and LDI are being integrated into a common platform," and "[m]anagement highlighted that RxClaim will be the PBM's go-forward technology solution and platform, and they will not be using the customized platform that NPS functions on."

- 48 -

122.    Griffin further admitted his knowledge of and involvement in the transition of NPS clients to the RxClaim platform when, on March 15, 2019, Griffin stated:

> In terms of the migration of – I should note that, for those of you who aren't as close to that operating platform [RxClaim], it is, in my opinion, the best in the industry. So this is an operating platform that can manage the most complex of businesses, from large corporate, union health plan, Med D. So it's a very strong operating platform, and this was the operating platform that was a part of the legacy LDI business.

Griffin has also indicated his direct involvement in the decisions regarding the PBM sales force, saying on August 6, 2018: "I've got a number of my former Medco sales and account management folks managing that for us here at CastiaRx."

123.    Acknowledging that he had been monitoring the severity of the PBM service issues during the Class Period, Griffin admitted on March 15, 2019 that "mid last year [2018] – into the fourth quarter, I brought in some consultants to help us evaluate our end-to-end processes, our structure."

**The Scope and Severity of the Service Failures and Customer Departures Support a Strong Inference of Scienter**

124.    Far from being too minor to warrant defendants' close attention and monitoring, Diplomat's service failures and client losses were significant enough to potentially force the Company into bankruptcy. This further supports an inference that defendants knew or recklessly disregarded the true facts at the time they were making the false and misleading statements.

125.    Given the pre- and in-Class Period statements by Hagerman and others, the Individual Defendants each knew that Diplomat's PBM business would compete on service, more so than price, in the small- to mid-size payer market, and that providing exceptional service would be critical to the PBM's growth, and Diplomat's overall growth. Given their importance, and the overall importance of the PBM acquisition to Diplomat's financial health, it is inconceivable that the Individual Defendants did not monitor the service failures as they were occurring.

- 49 -

126.    The Individual Defendants were also aware of the risks of terminating legacy PBM employees that established strong relationships with their customers.  For example, Hagerman and Saban both commented on the importance of retaining and integrating the legacy PBM management and sales force.  *See* ¶49.  On February 26, 2018, Park acknowledged that NPS and LDI were "unique in the relationships they have with their clients, [and] both have long durable relationships with their customers," which was "a huge value proposition."  Given the importance of these relationships, defendants knew of or recklessly disregarded the negative impact and increased risk of customer losses from the termination of key legacy PBM employees in early 2018.

127.    The Individual Defendants were also aware that once they switched either of the legacy PBM businesses from one claims processing system to another, there would be a risk of client disruption and promised to actively monitor the process.  For example, during the February 26, 2018 conference call, attended by defendants Park, Saban, and Kavthekar, Park stated:

> The claim systems we have right now are functioning effectively to really support the services for both these books of business [NPS and LDI].  We will be looking to make sure that irrespective of whether we've migrated from one platform to another, that there is no disruption to our member book of business.

128.    Thus, the Individual Defendants were on notice to carefully monitor the PBM business for, and said they would "make sure" that there were not any service failures, including service failures arising from the migration of one claims processing system to another.

129.    The service issues arising from the non-retention of NPS management in the acquisition, the failure to retain a sufficient sales force, and the failed migration of NPS customers over to the RxClaim claims processing system were so pervasive that they resulted in the loss of more than half of Diplomat's PBM business and the near collapse of Diplomat's entire business in little more than a year.  The severity of the declines is illustrated by the following chart showing the declines in quarterly PBM revenues from 2018 to 2019:

- 50 -



130.    Indeed, the divergence between defendants' overly rosy assessment of the integration and PBM business performance and the truth, as revealed at the end of the Class Period, further supports a strong inference of scienter.  For example, on February 26, 2018, defendant Park said: "If you looked at the gross revenues of the [two] PBMs we acquired, that's how you get to $800 million" and defendant Kavthekar added that the Company was expecting "low-double digit growth" in the PBM business.  At just 10% growth, that would equate to annual revenues of at least $880 million, or $220 million per quarter in the first year.  But Diplomat reported 2018 PBM revenues of just $729 million, nearly 20% short of $880 million.  And the lost business and renewals in 2018 had an expected compounding impact on 2019 with Diplomat reporting just $98 million in PBM revenues in 1Q19, a 49% decline from the prior year, and just $90 million in PBM revenues in 2Q19, a 52% decline from the prior year.  The divergence between defendants' purported "double digit" growth and the actual results is illustrated in the following chart:

- 51 -



131.    The significant customer complaints and losses would have been particularly noticeable in the PBM business, which Kavthekar explained on May 8, 2018, "tends to be a very stable, very predictable business" with results staying relatively static through the quarters.

132.    Moreover, the service issues were not confined, but broadly impacted the entire PBM business, causing the loss of customers ranging in size and type.  The service issues impacted the largest contracts, with the 2018 Form 10-K disclosing that Diplomat's four largest PBM customers, constituting 31% of the entire business, had all terminated their contracts.  And the service issues impacted a multitude of smaller contracts as well, with analysts from Barclays reporting on February 24, 2019 that "there are various individual small contract losses that culminate in a seemingly large headwind for 2019" and "the contract losses have a spread out end date through 2019."

**Executive Departures Support a Strong Inference of Scienter**

133. On January 7, 2019, Diplomat announced that the employment of Saban and Thigpen (CastiaRx's COO) had been terminated "effective immediately." Saban and Thigpen were hired by Diplomat specifically to run the PBM business. The timing of their departures – after the Company had partially corrected Saban's and other defendants' Class Period statements by disclosing massive PBM customer service failings and lost customers – further supports an inference of scienter.

134. On February 22, 2019, the same day that the Company withdrew its 2019 guidance issued just one month earlier and disclosed continued PBM losses and the need to write off a "significant portion" of the goodwill related to the failing PBM business, Park abruptly resigned from the Board, more than a year before his term was set to expire. Park's abrupt and early resignation from the Board the same day as the Company disclosed negative information supports an inference of scienter.

135. On March 14, 2019, Kavthekar's employment was terminated, "effective [on] April 5, 2019." The timing of his termination, just after defendants further revealed the PBM business's lost customers and dismal prospects due to the massive service failures, further supports an inference of scienter.

136. Moreover, the fact that each of these defendants were terminated, rather than departing for voluntary reasons, and that they were hired to run the PBM business, support a strong inference of scienter.

**Defendants' Obligations Under GAAP Support a Strong Inference of Scienter**

137. In accounting for the PBM acquisitions, Diplomat recorded a $447 million goodwill asset, representing the amount by which the purchase prices exceeded the fair value of the acquired companies' net assets. The value of the goodwill asset alone exceeded the purchase price of any previous acquisition in Diplomat's 42-year history. In addition, Diplomat recorded $208 million

- 53 -

worth of definite-lived intangible assets acquired from the PBM businesses, with $191 million attributed to "customer relationships" and $17 million attributed to "trade names and trademarks." The value of the customer relationships acquired from NPS and LDI alone exceeded the purchase price of all but one of Diplomat's previous reported acquisitions and were more than three times larger than the next largest asset (accounts receivable) acquired from the PBMs. Defendants reported the goodwill and intangible assets in the 1Q18 10-Q filed on May 8, 2018, the 2Q18 10-Q filed on August 7, 2018, and the 3Q18 10-Q filed on November 7, 2018.

138.     Under GAAP, defendants were required to monitor these assets and determine if any or all of it needed to be written off. Doing so required defendants Park, Griffin, and Kavthekar, who signed the financial statements or certifications, to monitor and analyze the sales, lost sales, customer relationships, and underlying performance of the PBM business as part of the Company's impairment testing.

139.     Notably, Diplomat's annual reports on Form 10-K, signed by Defendants Park, Griffin, and Kavthekar, state that the Company assesses both goodwill and intangible assets for impairment testing on a regular basis. For goodwill, the 2018 Form 10-K states for example, "goodwill is reviewed for impairment annually during the fourth quarter of each year, or more frequently if an event or change occurs that may indicate that fair value may be below carrying value." Such events could include "[u]nfavorable changes in the business climate or competitive environment, [Diplomat's] revenue forecasts . . . or developments [that] could cause changes in [the] estimated fair values." For intangible assets, the Forms 10-K state they "are reviewed for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable."

140.     In other words, the service disruptions and customer complaints occurring in 2018 would have constituted triggering events requiring defendants to analyze whether these accounts

- 54 -

needed to be written down in whole or in part prior to issuing the quarterly financial statements. To ensure compliance with these accounting and Company policies in May, August, and November 2018, defendants were required to monitor the PBM business for unfavorable changes, including any sales, lost sales, damage to customer relationships, or underlying performance issues that could threaten the Company's forecasts and estimated fair values.[6]

141. In fact, the Company admitted that goodwill was impaired in 2018 due to "reduced financial forecasts for the PBM business." The Company also admitted that intangible assets, including customer relationships, were impaired in 2018, due to "customer losses and reduced forecasts," necessitating a large write-off. However, the same events were occurring early in 2018 due to the service failures that necessitated lowering forecasts due to customer losses that were later disclosed to be 25% to 50% of the entire PBM business as discussed herein.

142. As further evidence of scienter, the Company's Forms 10-K state that goodwill impairment testing occurs, at a minimum, annually "during the fourth quarter." Yet, on November 6, 2018, during the fourth quarter, defendants were touting the "strong" PBM performance and the "new client wins," and minimizing client losses of $200 million as attributable to "one-off" issues, even though they would have been engaged in impairment testing that soon thereafter led to a write-off of 40% of the PBM goodwill and 40% of the intangible assets. In fact, just two months later, on January 7, 2019, defendants issued 2019 guidance that represented a 40% decline in PBM revenues from 2018.

---

[6] Notably, defendants were also required to follow these policies in accordance with GAAP, specifically, Accounting Standards Codifications 350-20-35-3 (goodwill) and 360-10-35-21 (intangible assets). In the SOX Certifications included with the Company's Forms 10-Q (¶¶75-77), defendants Park, Griffin, and Kavthekar assured investors that the Company's financial statements had been prepared "in accordance with generally accepted accounting principles."

- 55 -

**Defendants Had Motive**

143.   As discussed, the pharmaceutical industry has been subject to consolidation, with PBMs acquiring other PBMs, PBMs acquiring pharmacies, and pharmacies acquiring PBMs.  To remain viable in this environment, Diplomat needed to acquire companies or be acquired, neither of which would be possible if its stock price collapsed.  Thus, defendants had a reason to conceal the negative facts during the Class Period in order to both: (1) artificially inflate Diplomat's stock price to more cheaply acquire other companies; and (2) make Diplomat an attractive acquisition target.

144.   For example, Diplomat entered the PBM market by acquiring NPS and LDI, using $90 million of Company stock to fund the transactions.  Throughout the Class Period, defendants and analysts noted that Diplomat was evaluating the acquisition of additional PBMs to support that business.  During the February 26, 2018 conference call, for example, in response to an analyst question about PBM acquisitions, defendant Park responded: "Diplomat has always been a pretty active participant in finding opportunities, both organically and inorganically," *i.e.*, through acquisitions, "[a]nd we don't expect that strategy is going to change at all. . . .  And we are going to continue to be active in evaluating all the opportunities in the space."  Likewise, during the August 6, 2018 conference call, when asked by an analyst whether defendants "see potential opportunities for future PBM deals . . . in terms of potential M&A [mergers and acquisitions]," Griffin responded, "yes, we'll continue to evaluate those opportunities."

145.   Analysts likewise reported that additional PBM acquisitions were likely.  On March 2, 2018, for example, analysts from Deutsche Bank reported that "[w]e expect Diplomat to further capitalize on the middle market opportunity by stepping in as one of the leading consolidators in the space."  Analysts from Credit Suisse similarly reported on May 8, 2018 and August 6, 2018, that they "expect there to be a clear path for [Diplomat] to scale up its PBM offering longer term through continued M&A."

146.     To fund such transactions, Diplomat could use Company stock and cash, just as it did with the NPS and LDI acquisitions.  Thus, defendants had an incentive to increase (or at least maintain) the price of Diplomat shares.  The higher Diplomat's stock price, the less cash would be required to fund additional PBM acquisitions.

147.     On the flip side, Diplomat was also a potential acquisition target for larger PBMs throughout the Class Period, particularly since Hagerman (the co-founder) had retired.  On June 21, 2018, for example, analysts from Leerink reported that they "believe that the current management team is more open to a transaction than was the previous team, which was led by founder Phil Hagerman."  Indeed, analysts from Deutsche Bank reported on August 16, 2018 that Diplomat "has more natural potential acquirors than any other company in our universe."  On November 7, 2018, analysts from Lake Street Capital Markets similarly reported that recent consolidations among large healthcare companies made Diplomat "an obvious acquisition target."

148.     The acquisition of Diplomat could result in accelerated premiums being paid to Individual Defendants for their Diplomat holdings and free defendants of the massive problems in the PBM business.  To remain an attractive acquisition target, defendants were incentivized to conceal the PBM service failures and customer losses, the disclosure of which would reduce interest or drive any acquisition price down significantly.

## LOSS CAUSATION AND ECONOMIC LOSS

149.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Diplomat common stock and operated as a fraud or deceit on Class Period purchasers of Diplomat common stock by misrepresenting the success of the PBM integration and business, Diplomat's customer service, Diplomat's relationships with legacy and prospective PBM

customers, and omitting to disclose the significant integration failures, customer service failures, and customer dissatisfaction and losses.

150.    Defendants' false and misleading statements had their intended effect and directly and proximately caused Diplomat common stock to trade at artificially inflated levels, reaching a Class Period high of $28 per share.

151.    As a result of defendants' fraudulent conduct as alleged herein, the price at which Diplomat common stock traded was artificially inflated throughout the Class Period. When plaintiffs and other members of the Class purchased their Diplomat common stock, the true value of such common stock was substantially lower than the prices actually paid.[7] As a result of purchasing Diplomat common stock during the Class Period at artificially inflated prices, plaintiffs and other members of the Class suffered economic loss, *i.e.,* damages, under federal securities laws, when such artificial inflation dissipated.

152.    As a result of defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to the defendants, plaintiffs, and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Diplomat common stock at artificially inflated prices during the Class Period. Had plaintiffs and other members of the Class known the truth, they would not have taken such actions.

153.    When the misrepresentations and omissions that defendants had concealed from the market were leaked out and revealed through the series of partial disclosures beginning on November 6, 2018, and continuing through November 12, 2019, the price of Diplomat common stock fell dramatically, causing substantial losses to investors.

---

[7]    Class consists of all those who purchased or otherwise acquired the publicly-traded securities of Diplomat during the Class Period and were damaged thereby (the "Class").

4823-1352-6958.v1

154.     After the market closed on November 6, 2018, Diplomat began to reveal losses in the PBM business, reporting $200 million in lost contracts, a more than 10% decline in 3Q18 PBM revenues compared to the prior year, and a $200 million reduction to 2018 guidance.  As a result, Diplomat's stock price dropped from a close of $20.34 on November 6, 2018 to a close of $14.80 on November 7, 2018, and analysts cut their ratings and targets.

155.     On January 7, 2019, Diplomat revealed additional PBM losses, issued 2019 guidance that represented a 40% decline in PBM revenues from 2018, and began to reveal the internal causes of the lost contracts.  As a result, Diplomat's stock price dropped from a close of $14.10 on January 4, 2019 to a close of $12.62 on January 7, 2019, and analysts cut their ratings and targets.

156.     On February 22, 2019, Diplomat revealed that it would need to take an impairment charge "equal to a significant portion of the PBM's Goodwill and Definite-lived intangible assets," revealed additional PBM losses, and further revealed information about the source and causes of the PBM losses.  As a result, Diplomat's stock price dropped from a close of $13.46 on February 21, 2019 to a close of $5.87 on February 22, 2019, and analysts cut their ratings and targets.

157.     On November 12, 2019, Diplomat revealed further losses in the PBM segment and an additional substantial impairment charge to the goodwill and intangible assets related to the PBM business.  As a result, Diplomat's stock price dropped from a close of $6.20 on November 11, 2019 to a close of $3.10 on November 12, 2019, and analysts again cut their targets.

158.     The timing and magnitude of the decline in the price of Diplomat common stock negates any inference that losses suffered by plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  From the close of trading on November 6, 2018 through the close of trading on November 12, 2019, during which time Diplomat's stock price fell over 80% as a result of defendants' fraud being leaked out and revealed through a series of partial disclosures, the Standard

- 59 -

& Poor's 500 Index increased 12%, and the Standard & Poor's Small Cap 600 Index, comprising of public corporations in Diplomat's peer group, rose 0.5%, as illustrated in the following chart:

Diplomat Pharmacy, Inc. vs. S&P 500 and S&P 600 Small Cap
November 6, 2018 – November 12, 2019



159. Analyst reports reflected that the revelation of the previously undisclosed information was responsible for the stock declines. *See* ¶¶82-83, 88, 93-94.

160. As a result of their purchases of Diplomat common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**PRESUMPTION OF RELIANCE**

161. At all relevant times, the market for Diplomat common stock was an efficient market for the following reasons, among others:

(a) Diplomat common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 60 -

(b)     according to the Company's 2018 Form 10-K, the Company had more than 74 million shares of common stock outstanding as of March 15, 2019, demonstrating a very active and broad market for Diplomat common stock;

(c)     as a regulated issuer, Diplomat filed periodic public reports with the SEC;

(d)     Diplomat regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     Diplomat was followed by numerous securities analysts employed by major brokerage firms, such as JPMorgan, Credit Suisse, Leerink, Barclays, William Blair & Company, Wells Fargo Securities, LLC, Cowen and Company, and Morgan Stanley, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

162.    As a result of the foregoing, the market for Diplomat common stock promptly digested current information regarding Diplomat from publicly available sources and reflected such information in Diplomat's common stock price. Under these circumstances, a presumption of reliance applies to plaintiffs' purchases of Diplomat common stock.

163.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because plaintiffs' claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Diplomat's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

164.    The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Diplomat's Class Period filings and oral disclaimers.

165.    Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Diplomat who knew that those statements were false or misleading when made.

166.    Moreover, to the extent that defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading since they did not disclose that defendants were actually engaging in the very actions about which they purportedly warned of and/or had actual knowledge of material adverse facts undermining such disclosures.

167.    For example, the Class Period conference calls were accompanied by recitation of boilerplate "safe harbor statements," which referred investors back to the stale risk disclosures in the Company's annual report on Form 10-K for 2017 ("2017 Form 10-K") filed on March 1, 2018. Those disclosures were false and misleading because they merely purported to warn that the benefits of the acquisition might not be fully realized "*[i]f we experience difficulties with the integration*

- 62 -

*process*," but did not disclose that at the time of defendants' false and misleading Class Period statements the Company had already experienced difficulties in the integration process that were negatively impacting the PBM business and Diplomat's ability to realize any, much less all, of the benefits from the acquisitions. The risk disclosures made no reference, for example, to the lost customers due to the termination of legacy PBM management, who had strong relationships with the clients, the failure to establish a sufficient sales force, or the service issues arising from the termination of staff and abandonment of the NPS claims processing system and the migration of NPS customers onto LDI's claims processing system.

168. Moreover, the 2017 Form 10-K purported to warn that:

[T]he following risks which, individually or in aggregate, *may* have a material adverse effect on our business, affect our ability to achieve, or result in difficulties in realizing, the anticipated financial or strategic benefits and cost savings of an acquisition: the loss of key employees . . . impairment of existing relationships with our employees, distributors, suppliers, customers, or other constituents or those of the acquired companies; difficulty in integrating acquired operations, including restructuring and realigning activities, personnel, technologies, information and data security and products.

169. In truth, those risks had already materialized during the Class Period and were adversely affecting the PBM business and Diplomat's ability to realize the benefits of the acquisitions, including the loss of key legacy PBM employees, the impairment of customer and employee relationships, and difficulties in integrating technologies (most significantly, the claims processing systems).

## CLASS ACTION ALLEGATIONS

170. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Diplomat common stock during the Class Period. Excluded from the Class are: defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal

representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

171.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Diplomat common stock was actively traded on the NYSE.  According to the Company's 2018 Form 10-K, the Company had more than 74 million shares of common stock outstanding as of March 15, 2019.  While the exact number of Class members can only be determined by appropriate discovery, plaintiffs believe that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

172.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

173.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

174.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by or chargeable to defendants during the Class Period misrepresented or omitted material facts;

(c)    Whether the price of Diplomat common stock was artificially inflated during the Class Period; and

- 64 -

(d)      To what extent the members of the Class have sustained damages and the proper measure of damages.

175.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiffs are not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Diplomat and the Individual Defendants

176.    Plaintiffs incorporate the foregoing paragraphs by reference.

177.    During the Class Period, Diplomat and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

178.    These defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)      Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 65 -

(c)      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and other members of the Class in connection with their purchases of Diplomat common stock.

179.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Diplomat common stock during the Class Period, because, in reliance on the integrity of the market, plaintiffs and other members of the Class paid artificially inflated prices for Diplomat common stock and experienced losses when the artificial inflation was released from Diplomat common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiffs and other members of the Class would not have purchased Diplomat common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' false and misleading statements.

180.    By virtue of the foregoing, Diplomat and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Park, Griffin, and Kavthekar

181.    Plaintiffs incorporate the foregoing paragraphs by reference.

182.    Park, Griffin, and Kavthekar acted as controlling persons of Diplomat within the meaning of §20(a) of the Exchange Act.

183.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, practices, and PBM business, Park, Griffin, and Kavthekar had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

- 66 -

dissemination of the various statements that plaintiffs contend are false and misleading. Park, Griffin, and Kavthekar were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings, and other statements alleged by plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

184. As set forth above, Diplomat violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, defendants Park, Griffin, and Kavthekar are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.    Awarding such further relief, including any equitable/injunctive relief, as the Court

may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  December 6, 2019          ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                  JAMES E. BARZ (IL Bar # 6255605)
                                  FRANK A. RICHTER (IL Bar # 6310011)


                                           s/ James E. Barz
                                  ───────────────────────────────
                                          JAMES E. BARZ

                                  200 South Wacker Drive, 31st Floor
                                  Chicago, IL  60606
                                  Telephone:  312/674-4674
                                  312/674-4676 (fax)
                                  jbarz@rgrdlaw.com
                                  frichter@rgrdlaw.com

                                  Lead Counsel

DATED:  December 6, 2019          HOLZER & HOLZER, LLC
                                  COREY D. HOLZER (*pro hac vice* forthcoming)


                                           s/ Corey D. Holzer
                                  ───────────────────────────────
                                          COREY D. HOLZER

                                  1200 Ashwood Parkway, Suite 410
                                  Atlanta, GA  30338
                                  Telephone:  770/392-0090
                                  770/392-0029 (fax)
                                  cholzer@holzerlaw.com

                                  Counsel for Plaintiff Eugene Klabak

SULLIVAN, WARD, ASHER & PATTON, P.C.
MICHAEL J. ASHER
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075
Telephone: 248/746-0700
248/746-2760 (fax)
masher@swappc.com

HESSIAN & McKASY P.A.
WILLIAM A. CUMMINGS
3700 RBC Plaza
60 South 6th Street
Minneapolis, MN 55402
Telephone: 612/746-5770
612/746-5755 (fax)

Additional Counsel for Lead Plaintiff

4823-1352-6958.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 6, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
   & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

E-mail: jbarz@rgrdlaw.com

4823-1352-6958.v1

# Mailing Information for a Case 1:19-cv-01735 Iron Workers Local No. 25 Pension Fund, et al., v. Diplomat Pharmacy, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James Wallace Ducayet**
  jducayet@sidley.com,james-ducayet-9115@ecf.pacerpro.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,ajewell@millerlawllc.com,drobinson@millerlawllc.com,JRamirez@millerlawllc.com

- **Lucas Gilmore**
  lucasg@hbsslaw.com

- **Matthew Todd Hurst**
  mhurst@heffnerhurst.com,mheffner@heffnerhurst.com

- **Reed R Kathrein**
  reed@hbsslaw.com,danielles@hbsslaw.com,lisal@hbsslaw.com,sf_filings@hbsslaw.com

- **Daniel J. Kurowski**
  dank@hbsslaw.com,chi_filings@hbsslaw.com

- **Carl V. Malmstrom**
  malmstrom@whafh.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,drobinson@millerlawlllc.com,JRamirez@millerlawllc.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Nilofer Ibrahim Umar**
  numar@sidley.com,efilingnotice@sidley.com,nilofer-umar-6698@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)