**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IRON WORKERS LOCAL NO. 25 PENSION FUND, et al., | Case No. 1:19-cv-01735 |
| Plaintiffs, | Hon. Virginia M. Kendall |
| v. | |
| DIPLOMAT PHARMACY, INC., et al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................3

      A.     Diplomat Expands Into The PBM Business .................................................3

      B.     Diplomat's First PBM Selling Season ........................................................4

      C.     Diplomat Experiences Customer Losses And Disappointing Sales Results...........6

      D.     Diplomat Announces Sale To OptumRx .....................................................8

      E.     The Complaint .............................................................................................9

ARGUMENT.........................................................................................................................9

I.     Plaintiffs Fail To Adequately Allege A Materially False Or Misleading Statement.........10

      A.     Plaintiffs Fail To Adequately Allege That Defendants' Statements Regarding The PBM Integration And Customers Were Materially False Or Misleading.........................................................................................11

            1.     Plaintiffs Fail To Allege Particularized Facts Indicating These Statements Were False Or Misleading When Made. .................................12

            2.     Many Of These Alleged Misstatements Are Inactionable Statements Of Corporate Optimism. ............................................................14

      B.     Plaintiffs Fail To Adequately Allege That Defendants' Statements Regarding Internal Controls Were False Or Misleading When Made...................15

II.    Plaintiffs Fail To Adequately Allege A Strong Inference Of Scienter. ............................17

      A.     Plaintiffs Fail To Plead A Strong Inference That The Individual Defendants Had Contemporaneous Knowledge Of Facts Rendering Their Public Statements False Or Misleading. .............................................................17

            1.     Statements Regarding Integration And Clients.........................................18

            2.     Statements Regarding Internal Control Over Financial Reporting............20

      B.     Plaintiffs' Circumstantial Allegations Come Nowhere Close To Creating A Strong Inference Of Scienter. .............................................................21

III.   Plaintiffs Do Not State A Claim For Control Person Liability Under Section 20(a). .......25

CONCLUSION....................................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Alizadeh v. Tellabs, Inc.*,
    2015 WL 557249 (N.D. Ill. Feb. 9, 2015) ..............................................................................10

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
    827 F.3d 1229 (10th Cir. 2016) ...................................................................................21, 22

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
    2020 WL 60186 (N.D. Ill. Jan. 7, 2020) ..................................................................................21

*In re Bally Total Fitness Sec. Litig.*,
    2006 WL 3714708 (N.D. Ill. July 12, 2006) ..........................................................................24

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................................................10

*In re Brightpoint, Inc. Sec. Litig.*,
    2001 WL 395752 (S.D. Ind. Mar. 29, 2001) ..........................................................................13

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
    390 F. Supp. 3d 916 (N.D. Ill. 2019) .....................................................................................23

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ...........................................................................9, 10, 11, 12

*Cornielsen v. Infinium Capital Management, LLC*,
    916 F.3d 589 (7th Cir. 2019) ...........................................................................................9, 21

*Curry v. Yelp Inc.*,
    2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) ........................................................................13

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ..................................................................................15

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...................................................................................................24

*Fadia v. FireEye, Inc.*,
    2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ........................................................................15

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ..............................................................................................15

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)...................................................................................21, 24, 25

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ...............................................................................14, 19, 20

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) .........................................................................................22

*In re Level 3 Commc'ns Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) .....................................................................................15

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
902 F. Supp. 2d 329 (S.D.N.Y. 2012).............................................................................15

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)...............................................................................13

*M & M Hart Living Tr. v. Glob. Entm't, Inc.*,
2017 WL 5635424 (C.D. Cal. Aug. 20, 2017)...........................................................17, 24

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) .........................................................................................22

*NECA-IBEW Pension Fund v. N. Tr. Corp.*,
2013 WL 1290202 (N.D. Ill. Mar. 28, 2013)..................................................................10

*In re Newell Rubbermaid Inc. Sec. Litig.*,
2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .................................................................14

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ...................................................................................17, 24, 25

*Pierrelouis v. Gogo, Inc.*,
2019 WL 5208867 (N.D. Ill. Oct. 16, 2019)..............................................................10, 21

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) ......................................................................................9, 23

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) .........................................................................................23

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ...................................................................................17, 23, 25

*Roth v. OfficeMax, Inc.*,
527 F. Supp. 2d 791 (N.D. Ill. 2007) .........................................................................20, 21

iii

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..........................................................................................................13

*St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
    2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ............................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................ *passim*

*Wade v. WellPoint, Inc.*,
    892 F. Supp. 2d 1102 (S.D. Ind. 2012) .................................................................18

*In re Zagg, Inc. Sec. Litig.*,
    797 F.3d 1194 (10th Cir. 2015) .............................................................................21

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................24

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................17

15 U.S.C. § 78u-5(c)(1)(B) ...............................................................................................11

**Other Authorities**

Securities and Exchange Commission, Division of Corporation Finance,
    *Financial Reporting Manual* (excerpt) (last updated July 1, 2019) (Ex. U)...........................16

Securities and Exchange Commission, *Management's Report on Internal Control
    Over Financial Reporting and Certification of Disclosure in Exchange Act
    Periodic Reports* (September 24, 2007) ("SEC 2007 FAQ") (Ex. V) ....................................16

Securities and Exchange Commission, *Management's Report on Internal Control
    Over Financial Reporting and Certification of Disclosure in Exchange Act
    Periodic Reports Frequently Asked Questions* (October 6, 2004) ("SEC 2004
    FAQ") (Ex. X) ...............................................................................................................16

Defendants Diplomat Pharmacy, Inc. ("Diplomat" or the "Company"), Brian Griffin, Jeffery Park, Joel Saban, and Atul Kavthekar (the "Individual Defendants," and, together with Diplomat, the "Defendants"), respectfully submit this Memorandum in Support of their Motion to Dismiss the Consolidated Complaint (the "Complaint" or "CC") (D.E. 82).

## INTRODUCTION

In late 2017, Diplomat expanded into a new and highly competitive business. With its stand-alone specialty pharmacy experiencing headwinds, Diplomat acquired two pharmacy benefit managers ("PBMs") in an attempt to improve its overall market position. Over the course of the following year, Diplomat embarked on the project of integrating its two newly acquired PBM subsidiaries and worked to attract and retain PBM customers. Diplomat's expansion into the PBM business, however, did not go as hoped. As 2018 came to a close, Diplomat learned that it would lose a significant number of PBM customers, which, when combined with a softer outlook for signing new customers, resulted in sizable reductions in the long-term forecast for its PBM segment. When it learned of those losses and their impact, Diplomat did what the law requires: it disclosed them to its shareholders.

The Complaint, with the benefit of hindsight, dedicates itself to scrutinizing and critiquing business decisions made in connection with the PBM integration, such as the staffing levels of the sales organization and the decision to use one claims processing platform over another. But this is a securities fraud action, not a claim for business negligence. Measured by the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), the Complaint fails as a matter of law in two significant respects.

*First*, the PSLRA imposes strict pleading requirements that a complaint identify "with particularity" the alleged false statements and precisely *why* those statements were purportedly false or misleading. This is an even higher standard than the rigorous burden imposed under Rule

1

9(b). Plaintiffs do not meet it here with regard to any of the challenged statements. The Complaint is devoid of particularized facts showing the alleged misstatements were false or misleading *when made*. Moreover, many of the alleged misstatements are the sort of generic statements of corporate optimism—*e.g.*, that the PBM integration is going "well"—that courts routinely (and correctly) hold to be inactionable under the federal securities laws.

*Second*, the PSLRA requires that a complaint plead facts that give rise to a "strong inference" that each defendant acted with the requisite state of mind (*i.e.*, scienter, or an intent to defraud). To do so, Plaintiffs must plead facts creating a strong inference of fraud that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs provide no coherent theory of fraud. The Complaint is silent on critical issues, including who knew what and when with respect to the alleged integration failures, customer losses, and internal control deficiencies that form the backbone of Plaintiffs' allegations. Nor are there allegations of insider trading or other hallmarks of a fraudulent scheme. Instead, Plaintiffs offer generic bases for fraudulent intent—*e.g.*, the Individual Defendants' positions and their alleged access to information—of a sort that courts have repeatedly held insufficient to yield the required strong inference of scienter. When viewed in totality, the far more compelling inference is the opposing one: that the Individual Defendants had limited visibility into the PBM business's performance until late 2018 and early 2019 due to a compressed selling season; and they promptly informed the market of customer losses as they became known.

In short, Plaintiffs may not bootstrap a federal securities fraud claim from what are, at most, disagreements with business decisions. Both Congress and the Supreme Court have recognized the extraordinary costs and burdens of unfounded securities fraud class actions, which is precisely why a plaintiff attempting to pursue such a claim must satisfy heightened standards for

2

factual particularity and pleading meaningful *factual* support for a serious claim of fraud at the outset of the case. Plaintiffs have not met these requirements, and the Complaint should be dismissed.

## BACKGROUND

### A.     Diplomat Expands Into The PBM Business

Diplomat is the country's largest independent specialty pharmacy and is headquartered in Flint, Michigan. (CC ¶¶ 26, 40.) "Specialty" pharmacies differ from retail pharmacies in that they dispense high-cost medications that require special handling and administration, such as medications delivered by injection, infusion, and inhalation. (CC ¶ 35.) Diplomat's specialty pharmacies fill prescriptions for individual patients and are paid by PBMs or other "payers"— *e.g.*, health insurers, self-insured employers, or self-funded organizations like unions. (CC ¶ 3.) PBMs are hired by payers to administer certain or all aspects of their pharmaceutical drug plan benefits, including negotiating rebates with manufacturers, establishing lists of approved drugs, or selecting and contracting with pharmacies or specialty pharmacies. (CC ¶ 3.)

In 2016 and 2017, Diplomat faced an increasingly challenging business environment. PBMs began acquiring specialty pharmacies, which reduced demand for stand-alone specialty pharmacies (like Diplomat). (CC ¶ 6.) PBMs that had integrated specialty pharmacies could also offer bundled services that Diplomat could not, which resulted in losses of sizable contracts. (CC ¶¶ 6–7, 42.) Diplomat's growth slowed in 2016 and took a "sharp turn for the worse" in 2017, with EBIDTA declining by 5% year-over-year to $102 million. (CC ¶¶ 5–7.)

In response, Diplomat announced in November 2017 that it was expanding into the PBM business by acquiring National Pharmaceutical Services ("NPS") and LDI Integrated Pharmacy Services ("LDI"), two existing PBMs, for $47 million and $600 million respectively. (CC ¶ 44.) NPS was an Omaha-based PBM that managed benefits for 475,000 people and had an annual EBITDA of $5 million. (CC ¶ 44.) LDI, based in St. Louis, had 380,000 beneficiaries, an annual

EBIDTA of around $41 million, and a higher-margin customer base. (CC ¶ 44; Ex. A, 11/15/17 Call. Tr. at 3.)[1] The LDI acquisition was the largest acquisition in Diplomat's history. (CC ¶ 8.) After the acquisitions closed in December 2017, the Company combined NPS and LDI and renamed them CastiaRx. (CC ¶ 52; Ex. B, 3/1/18 Form 10-K at 14.) The Company made clear that this expansion into a new line of business came with risk. (*See* Ex. B, 3/1/18 Form 10-K at 15, 26–27.) Diplomat told shareholders that the "PBM marketplace is very competitive," which could "impair [its] ability to attract and retain clients"—including as a result of "pricing pressures." (*Id.* at 26.) CastiaRx's customers could "easily move" between competitors and "seek competing bids prior to expiration of their contracts." (*Id.*) And because of consolidation in the industry, PBM clients could be acquired and their business lost. (*Id.*)

Beyond the pressures inherent to the PBM marketplace, the Company explained that it faced additional challenges as a new entrant that needed to integrate two newly acquired companies. Large national firms, such as Express Scripts, CVS Caremark, and OptumRx, controlled significant market share and were "better established" than CastiaRx. (*Id.* at 15.) Further, the Company expressly warned its shareholders that despite all of its efforts, there could be no assurances that all would go smoothly: "difficulty in integrating [the] acquired operations" could materially impact the business, including because of the "loss of key employees," the "disruption of ongoing businesses or inconsistencies in standards, controls, [and] procedures," and the "impairment of existing relationships" with customers and employees. (*Id.* at 27.)

### B. Diplomat's First PBM Selling Season

Early in 2018, attention turned to Diplomat's first PBM selling season. Because the PBM sales cycle is long, often 12 to 18 months, CastiaRx's sales activity during 2018 was geared

---

[1] The Court may consider documents referenced in the Complaint, public records, and SEC filings. *See Tellabs*, 551 U.S. at 322.

toward retaining existing customers and attracting new ones for 2019. (Ex. A, 11/15/17 Call Tr. at 7; Ex. C, 2/26/18 Call Tr. at 7 ("new PBM sales will really be heading into 2019").) Diplomat's management outlined the sales cycle for CastiaRx, which was typical in the industry. Customers would bring requests for proposal ("RFPs") to the market during Q2 or Q3. (Ex. C, 2/26/18 Call Tr. at 7.) Payers (*i.e.*, the health insurance companies, self-insured employers, and other entities with which PBMs contract) would then make final decisions and award contracts well into Q4. (CC ¶¶ 33, 37; Ex. B, 3/1/18 Form 10-K at 14; Ex. C, 2/26/18 Call Tr. at 7.) CastiaRx focused especially on small- and middle-market payers (CC ¶ 39), whose decisionmaking tended to skew later into the year (and even into the following year, with agreements retroactive to January 1). (Ex. D, 5/8/18 Call Tr. at 7; Ex. E, 8/6/18 Call Tr. at 9–10; Ex. F, 9/12/18 Conf. Tr. at 6.) This sales cycle results in substantial business being signed (or lost) at year-end. (*See, e.g.*, Ex. C, 2/26/18 Call Tr. at 7; Ex. E, 8/6/18 Call Tr. at 9–10.)

As early as May 2018, analysts asked about the 2019 PBM selling season. (Ex. D, 5/18/18 Call Tr. at 7.) While noting positive developments (*e.g.*, CC ¶¶ 58(b), 65(h)–(i)), Company management repeatedly emphasized that they had limited visibility—particularly with respect to ultimately attracting or retaining customers given the year-end dynamic described above:

- May 2018: Mr. Park stated that it is "still early" in the selling season and the Company would not be "giving an outlook on our 2019 selling season" until subsequent quarters. (Ex. D, 5/8/18 Call Tr. at 7.)

- September 2018: Mr. Kavthekar explained that the "unique characteristics of this marketplace," in which "decisions aren't typically made until much, much later in the year," result in not having "visibility … until really deep into the year." (Ex. G, 9/5/18 Conf. Tr. at 5–6.)

- September 2018: responding to a question about the selling season, Mr. Griffin stated that "we don't really have visibility at this point," including as to how RFP volume will "translate[] into win rates," and noted that decisions are made into January. (Ex. F, 9/12/18 Conf. Tr. at 6.)

5

An analyst covering healthcare companies noted that Diplomat would not "really be able to communicate" the results of the selling season "until 2019." (Ex. G, 9/5/18 Conf. Tr. at 6.)

### C. Diplomat Experiences Customer Losses And Disappointing Sales Results

Over the course of the year, the Company disclosed customer losses. In May 2018, a few months into the alleged Class Period, the Company indicated that PBM revenues would be lower in the second half of the year due to the loss of legacy NPS clients. (CC ¶ 60(c); Ex. D, 5/8/18 Call Tr. at 5.) Consistent with that disclosure, the Company stated in August 2018 that "certain legacy low-margin contracts" would be exiting the business. (CC ¶ 65(j); Ex. E, 8/6/18 Call Tr. at 6.) An analyst from Robert W. Baird & Co. further noted in September 2018 that the Company had been "very public" and "open" about "a couple of larger but very low margin accounts that are winding down." (Ex. G, 9/5/18 Conf. Tr. at 4; *see also* CC ¶ 68(b).)

On November 6, 2018, Diplomat discussed two large-revenue, low-margin clients that had been lost effective January 1, 2019. (Ex. H, 11/6/18 Call Tr. at 12.) The bid for the first customer's business had been submitted by one of the legacy PBMs before Diplomat had acquired it and thus without being able to leverage the benefits of the combined company, and, for that reason, was a "one-off" loss. (*Id.*) The second client was bought by a larger health plan. (*Id.*) Together these two customers accounted for 4% of Diplomat's total revenue, or 25% of its PBM segment revenue. (*Id.* at 4–5.) But because the Company was still "in the midst of the 2019 PBM selling season" and the circumstances of these losses were unique, Diplomat management made clear that they did not have full visibility into the PBM's 2019 outlook. (*Id.* at 5, 13.)

The Company continued to experience customer losses and struggled to win new business as the selling season came to a close. On January 7, 2019, the same day that management issued preliminary guidance for 2019, management disclosed that there had been an "additional $120 million combined revenue impact from [PBM] client losses" since November 6,

2018. (CC ¶ 84.) While the Complaint falsely alleges that Mr. Griffin contradicted his "previous[] claim[]" that the customer losses discussed on the November 6, 2018 earnings call were due to one-off issues (CC ¶ 85), Mr. Griffin in fact confirmed those losses were due to the same factors that he had previously described. (Ex. I, 1/7/19 Conf. Tr. at 5.) Rather, Mr. Griffin clarified that there had been "***further losses since our last call*** … primarily the result of poor execution on client retention." (*Id.* at 6 (emphasis added).)

On February 22, 2019, Diplomat announced that it was postponing the release of its fourth quarter and full year 2018 financial results, recording a goodwill impairment charge for its PBM business, and withdrawing its preliminary 2019 outlook. The press release explained that CastiaRx's performance had declined further since the January 7, 2019 announcements: as stated, "January results have come in significantly below expectations," and "Diplomat has been notified of additional customer losses in its PBM business since early January, which combined with a softer outlook for client wins and other factors has led to a lower-than-previously forecasted outlook for [Diplomat's] PBM business in 2019." (Ex. J, 2/22/19 Form 8-K.)[2]

On a March 15, 2019 call to discuss its fourth quarter 2018 results, management elaborated that the customer losses since January were "primarily due to price, as well as service and execution issues experienced in 2018, tied to the migration of the legacy PBM businesses to a single operating platform." (Ex. M, 3/15/19 Call Tr. at 3.) Management had previously disclosed in the summer of 2018 that all of CastiaRx would use RxClaim, the software platform used by legacy LDI to process beneficiaries' claims (and also used by large PBMs operated by CVS and UnitedHealth Group). (CC ¶¶ 36, 121; Ex. N, 6/21/18 Analyst Rpt. at 1, 5.) Analyst

---

[2] The Company's reported revenue of $5.493 billion and adjusted EBITDA of $167.8 million for 2018, which Plaintiffs do not contend were misstated, were in line with its initial full-year guidance. (*Compare* Ex. K, 3/15/19 Form 8-K at Ex. 99.1, *with* Ex. L, 2/26/18 Form 8-K at Ex. 99.1 (projecting $5.3 – $5.6 billion in revenue and $164 – $170 million adjusted EBITDA).)

reaction had been positive, calling the Company's decision to use RxClaim, rather than a "home-grown solution," a "wise move" because it was scalable, customizable, and allowed for better data analysis. (Ex. N, 6/21/18 Analyst Rpt. at 1, 5.) Sometime during the mid-to-late third quarter of 2018, however, the Company experienced issues related to that transition. (CC ¶ 100.) The transition provided an opportunity for some legacy NPS customers to put their business out to bid, and the Company was unable to renew certain of those existing customers, resulting in customer losses at year-end 2018 and later. (CC ¶ 87; Ex. M 3/15/19 Call Tr. at 3.)

On March 18, 2019, the Company issued its Form 10-K. The Form 10-K disclosed that, during a year-end assessment, the Company had identified a material weakness in internal control over financial reporting ("ICFR") related to the PBM's revenue controls. (CC ¶ 102.) No errors in reported revenue were identified (and none are alleged here). This was the first Form 10-K in which management's ICFR assessment was required to include within its scope the PBM business. In the prior year, management, as permitted under SEC guidance, excluded the newly acquired PBM business from its annual ICFR assessment. (Ex. B, 3/1/18 Form 10-K at 61.)

### D. Diplomat Announces Sale To OptumRx

On August 9, 2019, the Company announced that it was reviewing strategic alternatives, including a sale of the Company. (Ex. O, 8/9/19 Form 8-K.) By November 2019, following the continued decline of both Diplomat's PBM and legacy specialty pharmacy businesses—neither of which Plaintiffs tie to any alleged misstatement—the Company announced a substantial doubt regarding its ability to continue as a going concern. (CC ¶ 108; Ex. P, 11/12/19 Form 8-K.) On December 9, 2019, Diplomat announced its acquisition by OptumRx. (Ex. Q, 12/9/19 Form 8-K.) The transaction is expected to close February 10, 2020. (Ex. R, Schedule 14D-9/A.)

8

### E.     The Complaint

On December 6, 2019, Plaintiffs filed their Complaint alleging violations of Section

10(b) and 20(a) of the Securities Exchange Act of 1934 during a Class Period of February 26,

2018, to November 11, 2019. (CC ¶ 1.) Plaintiffs name as Defendants the Company as well as its

current CEO Brian Griffin (since June 2018), former interim CEO Jeffery Park (January 2018 –

May 2018),[3] former CFO Atul Kavthekar (May 2017 – March 2019), and former President Joel

Saban (August 2017 – January 2019). Plaintiffs claim that the Defendants made false or

misleading statements between February 26 and November 7, 2018, and then proceeded to reveal

the "truth" in a series of corrective disclosures from November 6, 2018, to November 12, 2019.

(CC ¶¶ 57–109.) The Complaint does not allege the Company's financial statements were

misstated. Instead, Plaintiffs challenge (primarily oral) statements regarding: "(1) integration and

clients; and (2) internal control[] over financial reporting." (CC ¶ 57.)

## ARGUMENT

To state a claim for securities fraud under Section 10(b), Plaintiffs must adequately

allege, amongst other things, (1) that the statement was materially false or misleading when

made; and (2) scienter—*i.e.*, an intent to defraud—by the person making the statement at issue.

*See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d

952, 954 (7th Cir. 2012). In addition to alleging the "who, what, when, where, and how" required

by Federal Rule of Civil Procedure 9(b)'s heightened standard for fraud, *Cornielsen v. Infinium*

*Capital Management, LLC*, 916 F.3d 589, 598 (7th Cir. 2019), the Complaint must also satisfy

the PSLRA's "heavy burden of pleading" falsity and scienter. *City of Livonia Emps.' Ret. Sys. v.*

---

[3] Mr. Park also served on the Company's board from June 2017 to February 2019. No claims
against him are based on statements he made in that capacity.

9

*Boeing Co.*, 711 F.3d 754, 757 (7th Cir. 2013). The Complaint fails to adequately allege either element, each of which provides an independent ground for dismissal.

**I.    Plaintiffs Fail To Adequately Allege A Materially False Or Misleading Statement.**

Plaintiffs do not adequately allege that any statement at issue was materially false or misleading when made. The PSLRA requires that Plaintiffs "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(1)). This is an even higher standard than Rule 9(b). *Alizadeh v. Tellabs, Inc.*, 2015 WL 557249, at \*5 (N.D. Ill. Feb. 9, 2015). It is not enough for Plaintiffs merely to identify statements and assert they are false; instead, Plaintiffs must allege with particularity *why* and *how* each statement was false or misleading. *Pierrelouis v. Gogo, Inc.*, 2019 WL 5208867, at \*5 (N.D. Ill. Oct. 16, 2019) ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those segments were false, does not meet the standard set by the PSLRA." (quotation omitted)). And Plaintiffs must allege that the statements were false or misleading "when made" (not incorrect in retrospect). *Id.* at \*6; *see also Boeing*, 711 F.3d at 758 ("There is no securities fraud by hindsight." (quotation omitted)).

Moreover, when liability is premised on an omission, Plaintiffs "must allege not only information that was withheld, but also information whose disclosure was necessary to prevent information that was disclosed from being misleading." *NECA-IBEW Pension Fund v. N. Tr. Corp.*, 2013 WL 1290202, at \*10 (N.D. Ill. Mar. 28, 2013); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). The Complaint challenges the Defendants' statements concerning (1) the status of the

10

PBM's integration and interactions with the PBM's existing and potential customers; and (2)

internal control over financial reporting.[4]

### A. Plaintiffs Fail To Adequately Allege That Defendants' Statements Regarding The PBM Integration And Customers Were Materially False Or Misleading.

Plaintiffs first allege a laundry list of misstatements regarding the status of the PBM

integration and interactions with current and potential customers:

- Statements about the general progress of the integration, *e.g.*, that it was "off to a strong start," going "well," or "successful" (CC ¶¶ 58(a)–(b), 59, 60(b), 65(a), 65(g)–(h), 68(a), 69(a)–(c), 73(a)–(b));

- Statements reporting realized and anticipated synergies from the PBM integration (CC ¶¶ 60(a), 65(a)–(c), 73(c));

- Statements reflecting interactions with current and potential customers, including reporting positive interactions, discussions of contract terms, and disclosing client losses (CC ¶¶ 58(a)–(c), 60(c)–(e), 65(d), 65(g), 65(i)–(j), 73(d)–(g));

- Statements containing updates on the selling season, *e.g.*, indicating increased RFP volume and general interest in CastiaRx (CC ¶¶ 65(c), 65(h)–(i), 68(b), 69(d), 73(d)–(f), 73(h)–(i)); and

- Statements reflecting optimism about the PBM businesses and its competitive strengths, *e.g.*, noting positive "momentum" and being "quite pleased with our PBM results" (CC ¶¶ 58(d), 59, 60(c), 60(f), 64, 65(c)–(f); 69(e), 72, 73(a)).

Plaintiffs allege that these statements were affirmatively false, misleading by omission, or both.

(*See* CC ¶¶ 63, 67, 71, 74.) Plaintiffs do not satisfy the PSLRA's requirements for pleading a

materially false or misleading statement under either theory because they fail to adequately

allege that these statements were false or misleading when made, and also because many of the

statements are inactionable statements of corporate optimism.

---

[4] While the Complaint references certain statements related to the Company's guidance and projected growth for 2018 (*see* CC ¶¶ 58, 59), Plaintiffs do not allege they were false or misleading. (*See* CC ¶¶ 63, 67, 71, 74.) Because these statements are forward-looking, they are protected under the PSLRA's safe harbor provision unless Plaintiffs can allege that the Individual Defendants had *actual knowledge* the statements were false when made. *See* 15 U.S.C. § 78u-5(c)(1)(B); *Boeing*, 711 F.3d at 754. The Complaint does not and cannot do so.

### 1. Plaintiffs Fail To Allege Particularized Facts Indicating These Statements Were False Or Misleading When Made.

Plaintiffs fail to allege any contemporaneous, particularized facts rendering the Individual Defendants' statements regarding the PBM integration or customer interactions false or misleading when made. This deficiency pervades Plaintiffs' allegations.

*First*, the Complaint includes numerous general statements indicating that the "integration" was going well. But Plaintiffs do not allege any particular problems arising in the integration process prior to Q3 2018. And statements that the integration was going well *on the whole* do not reasonably imply that every aspect of it was going smoothly. As the Seventh Circuit has explained, there is "no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time.'" *Boeing*, 711 F.3d at 758–59. With respect to specific statements made in September 2018 about the claims platform integration (CC ¶ 69(b)–(c)), Plaintiffs allege no particularized facts indicating that significant integration issues had arisen at the time of those statements (as opposed to later in the third quarter). Indeed, the Complaint's only allegation on this point is Mr. Griffin's statement that those issues arose *later* in the third quarter. (CC ¶ 100 (discussing service issues "mid to through third quarter of '18").)

*Second*, Plaintiffs claim statements about synergies generated by the PBM integration were false or misleading because they were generated by cuts to the legacy PBMs' sales staff and departures of legacy NPS management that harmed the Company in the long run. (*E.g.*, CC ¶¶ 63(c), 67(b).) This argument fails. Plaintiffs allege no particularized facts indicating that either of these factors drove synergies. Rather, the Company attributed synergies to improvements in client contracts, manufacturer discounts, and improved cost of goods—none of which Plaintiffs allege facts contradicting. (*See* CC ¶¶ 65(b), 65(g); Ex. H, 11/6/18 Call Tr. at 2.) Plaintiffs try to use these statements as a path to challenge alleged *business decisions*. But Plaintiffs may not

12

bootstrap an allegation of corporate mismanagement into a claim for securities fraud. *See, e.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562 (S.D.N.Y. 2014) ("This narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud. This is not the law."); *In re Brightpoint, Inc. Sec. Litig.*, 2001 WL 395752, at *19 (S.D. Ind. Mar. 29, 2001) (Hamilton, J.) ("Mismanagement, a poorly timed shift in business strategy, or even negligence on the part of [the company]'s management … will not support a claim of securities fraud.").[5]

*Third*, Plaintiffs contend that statements about positive customer interactions and increased RFP volume were false or misleading. But the Complaint contains no particularized facts indicating that positive conversations did not in fact occur or that RFP volumes had not in fact increased year-over-year. Instead, Plaintiffs rely on three complaints lodged on the Better Business Bureau's webpage by individuals whose benefits CastiaRx managed on the payer's behalf. But complaints from three of the hundreds of thousands of beneficiaries whose benefits CastiaRx managed in no way implies that the Company was experiencing systemic issues, much less issues that would lead to significant customer losses. *See Curry v. Yelp Inc.*, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015) ("every large company can expect to have some customer complaints").[6] Nor do the ultimately disappointing results of the Company's PBM selling season render the Individual Defendants' statements made months prior false or

---

[5] Indeed, Plaintiffs do not adequately allege that significant cuts in sales staff even took place. Plaintiffs assert that because Mr. Griffin stated in January 2019 that Diplomat was "executing ... a plan to expand our sales and account management teams," Diplomat effectively admitted that it had cut too many people. (CC ¶ 85.) That is pure speculation. Expanding a team suggests that it needed to be bigger, not that it had been previously downsized. (*See also* CC ¶ 122 (August 2018 statement reflecting *hiring* PBM "sales and account management" staff); Ex. S, 5/7/19 Call Tr. at 11 ("the legacy PBMs really did not have large sales and account management").)

[6] Only five total complaints were made on CastiaRx's Better Business Bureau webpage at the time of the alleged misstatements. (Ex. T, BBB Webpage.)

misleading. That would be nothing more than an impermissible attempt to argue fraud by hindsight. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007) ("Hindsight is the only basis of the proposed inference—and, as the [U.S. Supreme] Court observed in *Tellabs* … there is no 'fraud by hindsight.'" (quoting 551 U.S. at 320)).

*Fourth*, Plaintiffs claim that Defendants' disclosures of customer losses were misleading, presumably as "half-truths." But Plaintiffs do not allege particularized facts showing what the "whole truth" would have been regarding customer losses at the time of these statements, much less that it contradicted Defendants' public statements. For example, Plaintiffs challenge August and September 2018 disclosures of certain high-revenue low margin contract losses, which were expected to result in a percentage revenue decrease in the single digits. (CC ¶¶ 65(j), 68(b).) However, they do not allege that any additional or larger losses were then known.

*Finally*, Plaintiffs allege that numerous positive statements regarding the PBM business were misleading because the Company was experiencing service issues that resulted in customer losses and failures to win new business. But, again, Plaintiffs provide few particulars. With respect to the RxClaim transition, for instance, the Complaint does not contain any particularized facts regarding how it impacted customers at the time, much less that the (unspecified) issues that arose would result in customer losses down the line. Nor does the Complaint provide a single example of a known or anticipated customer loss that the Company failed to timely disclose. These threadbare allegations fail to meet the exacting requirements of the PSLRA.

### 2. Many Of These Alleged Misstatements Are Inactionable Statements Of Corporate Optimism.

Many of Defendants' statements about the PBM integration are not actionable for an additional reason: they are, in whole or in part, inactionable statements of corporate optimism. *See In re Newell Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *7 (N.D. Ill. Nov. 14, 2000)

14

(granting motion to dismiss where statements "are too vague to be actionable; they are, in the words of the Seventh Circuit, mere 'puffery,' lacking the 'requisite specificity to be considered anything but optimistic rhetoric'" (citation omitted)). The Complaint is littered with generic positive statements about the integration—*e.g.*, that the integration was off to a "strong start," had "progressed rapidly," "gain[ed]" and "continued momentum," was going "well," and had "been very successful," as well as statements praising the integration team. (*See* CC ¶¶ 58(a)–(b), 59, 60(b)–(c), 60(e), 64, 65(c), 65(h), 68(a), 69(a)–(c), 73(a)–(b).)

These are precisely the sort of statements that courts have repeatedly held to be inactionable puffery in the context of an integration. *See, e.g.*, *In re Level 3 Commc'ns Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (integration "progressing well"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997) (integration "experienced 'substantial success'"); *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7–8 (N.D. Cal. Nov. 14, 2016) (integration "off to a really good start" and "product synergies are strong"); *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 341–42 (S.D.N.Y. 2012) (integration "progressing well" and "off to a promising start"); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008) (integration "already a success," and "continuing smoothly").[7]

### B. Plaintiffs Fail To Adequately Allege That Defendants' Statements Regarding Internal Controls Were False Or Misleading When Made.

Plaintiffs also fail to allege facts demonstrating that Defendants made false or misleading statements regarding internal control over financial reporting in the Company's 2018 Forms 10-

---

[7] Several statements in the Complaint contain generic praise for the competitive strengths of the Company. (*See* CC ¶ 58(c) ("clinical and specialty services strength"); ¶ 65(f) ("unique set of services … sets us apart"); ¶ 69(e) ("operating platform" is "best in the industry")). These statements too are inactionable puffery. *See St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *7 (N.D. Ill. Feb. 28, 2011).

Q (filed on May 8, August 7, and November 7 of that year). Plaintiffs claim Defendants falsely stated that the Company's internal control over financial reporting was effective and free of material weaknesses despite having failed to implement effective controls with respect to the acquired PBM business. (CC ¶¶ 75–78.) This position is deficient in several respects.

To begin, the challenged statements did not speak to the *PBM business's* ICFR. Pursuant to SEC guidance, for one year following the completion of an acquisition, an acquiring company may exclude the acquired business from its evaluation of ICFR. (*See* Ex. U, SEC Financial Reporting Manual at 213; Ex. V, SEC 2007 FAQ at Question 3.) That is what Diplomat did here. Diplomat disclosed in its 2017 Form 10-K that it had excluded the newly acquired PBM business from management's year-end assessment of ICFR. (Ex. B, 3/1/18 Form 10-K at 61.) When Diplomat stated in its quarterly reports that there had been "no changes" with respect to ICFR, it was indicating there had been no changes to the internal controls *on which management had previously opined*—which did not include CastiaRx. (CC ¶¶ 75–77; *see also* Ex. V, SEC 2007 FAQ at Question 7 (SEC: companies not required to disclose changes in ICFR prior to management's initial report).) Because the LDI and NPS acquisitions did not close until late 2017, management did not need to opine on the PBM's ICFR until the 2018 Form 10-K, in which the Company disclosed that management had identified a material weakness in ICFR in its PBM subsidiaries "during the fourth quarter of 2018." (Ex. W, 3/18/19 Form 10-K at 30–31.)

Moreover, the Complaint contains no particularized allegations regarding the nature, extent, and timing of the internal control problems disclosed in the 2018 Form 10-K—including any facts bearing on whether these issues rose to the level of a material weakness at the time of the alleged misstatements. (*Cf.* Ex. X, SEC 2004 FAQ at Question 11 (SEC: a company need not disclose a significant deficiency that does not, by itself or in combination with others, rise to the

16

level of a material weakness).) The mere fact that the Company later disclosed internal control deficiencies does not establish that previous statements on that topic were false or misleading when made. *See M & M Hart Living Tr. v. Glob. Entm't, Inc.*, 2017 WL 5635424, at \*8–9 (C.D. Cal. Aug. 20, 2017). That is yet another variation on fraud by hindsight.

## II.    Plaintiffs Fail To Adequately Allege A Strong Inference Of Scienter.

In addition to failing to adequately allege a materially false or misleading statement, Plaintiffs do not allege a strong inference of scienter—a separate and independent ground for dismissal. A plaintiff claiming fraud under Section 10(b) must allege scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). Scienter may be "demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (citation omitted). "Through the PSLRA, Congress requires that plaintiffs 'state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

This is a demanding standard. It requires that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. This is an "inherently comparative" inquiry, and "the court must take into account plausible opposing inferences." *Id.* at 323. Plaintiffs must make this showing as to *each* defendant and *each* statement at issue. *See* 15 U.S.C. § 78u-4(b)(2)(A); *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Plaintiffs come nowhere close to satisfying this requirement.

### A.    Plaintiffs Fail To Plead A Strong Inference That The Individual Defendants Had Contemporaneous Knowledge Of Facts Rendering Their Public Statements False Or Misleading.

The Complaint does not include a single particularized allegation that any Individual Defendant had contemporaneous knowledge of undisclosed facts that rendered his public

17

statements false or misleading. Specifically, Plaintiffs allege no facts—let alone any internal or first-hand source—indicating who knew what and when with respect to the alleged integration failures, customer services issues, customer losses, or deficiencies in internal control over financial reporting. Unlike many Section 10(b) complaints, the Complaint does not cite a single former employee or other "confidential witness." *Cf. Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1129 (S.D. Ind. 2012) ("confidential witnesses" are "common in private securities lawsuits"). Nor does the Complaint identify and describe written reports or other documents received by the Individual Defendants regarding these matters. This deficiency undermines each of Plaintiffs' theories.

### 1. Statements Regarding Integration And Clients

Plaintiffs' primary theory is that Defendants knowingly concealed that various customer service issues that took place at earlier points in 2018 would cause Diplomat to lose significant contracts and fail to win new business in late 2018 and early 2019. To support this theory, Plaintiffs rely on allegations concerning: (1) a problem that arose in transitioning legacy-NPS clients to the RxClaim platform (*e.g.*, CC ¶¶ 71(a), 71(d)); (2) staffing issues, particularly the departures of legacy NPS management and a purportedly understaffed sales department (*e.g.*, CC ¶ 63(b)–(c)); and (3) three online complaints lodged by individuals with the Better Business Bureau (*e.g.*, CC ¶¶ 53, 55–56). In each instance, Plaintiffs fail to allege particularized facts demonstrating that the Individual Defendants had knowledge of material customer service issues at the time of the alleged misstatements, much less that they knew or anticipated those issues would lead to material customer losses or an inability to generate new business.

*First*, though the Complaint heavily emphasizes purported integration failures related to the RxClaim migration, the only detail found in the Complaint regarding the timing of those issues is a statement by Mr. Griffin that an issue arose sometime in Q3 2018. (CC ¶ 100.) The

18

Complaint is otherwise silent on the nature, scope, and duration of the migration issue and on whether there was any contemporaneous customer reaction. Nor does the Complaint contain a single particularized fact indicating that any Individual Defendant actually knew of the migration issue, much less that it would cause customer losses, at the time of the alleged misstatements. That Diplomat ultimately stated that issues related to the migration "had an impact" on customer losses that occurred months later (and after the last alleged misstatement) does not mean those losses were anticipated at the time. (CC ¶ 100.) Plaintiffs' claim to the contrary is nothing more than an impermissible claim of fraud by hindsight. *Higginbotham*, 495 F.3d at 759–60.[8]

*Second*, Plaintiffs' theory that the Company was prioritizing short-term gains, in the form of staffing cuts, at the expense of long-term success is likewise deficient. The Complaint contains no particularized factual allegations to suggest that the Individual Defendants knew at the time of the alleged misstatements that staffing issues would result in customer losses months into the future. As to the departures of legacy-NPS management, for example, the Complaint contains no particularized allegations regarding any complaints actually lodged with any of the Individual Defendants by NPS legacy clients at the time of the alleged misstatements. At most, Plaintiffs allege that Diplomat made a poor business decision by not retaining legacy NPS management (presumably in favor of legacy LDI's) and not hiring adequate sales staff. But, again, allegations of internal corporate mismanagement do not establish securities fraud.

*Third*, Plaintiffs' assertion that the Company received customer complaints also fails to support that the Individual Defendants knew that their statements were false when made. The Complaint does not contain any particularized factual allegation that any of the Individual

---

[8] Plaintiffs also suggest that management made the wrong decision in selecting the RxClaim platform, used by legacy LDI, rather than the legacy NPS's proprietary software. (CC ¶¶ 53, 129.) Such allegations are merely a hindsight second-guessing of a business decision—not fraud.

19

Defendants knew of any complaint at the time of the alleged misstatements, *e.g.*, through an internal report or client communication. And while claiming the Company received "numerous customer complaints," as discussed above, Plaintiffs identify only three complaints lodged on the Better Business Bureau's webpage by individuals whose pharmacy benefits were managed by CastiaRx. (CC ¶¶ 53–55, 63(d).) These allegations come nowhere close to creating a strong inference of large, systemic issues likely to be brought to senior management's attention.

In short, Plaintiffs fail to allege particularized facts suggesting that the Individual Defendants fraudulently concealed that customer losses would take place in the months after their statements. To the contrary, the Complaint affirmatively undercuts such a notion. Just a few months into the alleged Class Period, and before Plaintiffs allege the "truth" began to emerge, Defendants repeatedly disclosed expected customer losses of which they *were* aware. (*See* CC ¶¶ 60(c), 65(j), 68(b).) Indeed, an analyst noted in September 2018 that the Company had been "open" about anticipated losses of large revenue clients. (*See* p. 6, *supra*.) Moreover, the Individual Defendants repeatedly stated that they had limited visibility into the outcome of CastiaRx's selling season, and would not have greater visibility until "deep into the year." (*See* p. 5, *supra*.) These disclosures support a far more compelling inference of transparency with the market rather than an opposing inference of securities fraud.

### 2. Statements Regarding Internal Control Over Financial Reporting

The Complaint also does not contain particularized facts indicating the Defendants had knowledge of internal control deficiencies at the time of the alleged misstatements. Plaintiffs allege that Defendants made false and misleading statements regarding ICFR in the Company's 2018 Forms 10-Q. (CC ¶¶ 75–78.) But the Complaint is silent on Defendants' knowledge of any of these matters *at the time of the alleged misstatements*—this is simply another impermissible attempt at fraud by hindsight. *See Higginbotham*, 495 F.3d at 759–60; *Roth v. OfficeMax, Inc.*,

527 F. Supp. 2d 791, 797 (N.D. Ill. 2007) ("[M]ere allegations of … statements regarding the internal controls of a company that are later proven to be false[] are not sufficient to demonstrate that those who made the statements committed securities fraud."). [9]

### B. Plaintiffs' Circumstantial Allegations Come Nowhere Close To Creating A Strong Inference Of Scienter.

Lacking particularized factual allegations of knowledge, Plaintiffs rely on a hodgepodge of circumstantial allegations to establish scienter. These allegations are precisely the sort of boilerplate that courts repeatedly reject as failing to establishing the requisite strong inference.

*Positions/Core Operations.* Plaintiffs first highlight the Individual Defendants' senior positions in the Company, involvement with the PBM business, public statements, and access to confidential information, as well as the importance of the PBM business. (*See* CC ¶¶ 110–23.) But courts routinely hold that such allegations do not support a strong inference of scienter. *See, e.g.*, *Cornielsen*, 916 F.3d at 602; *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245 (10th Cir. 2016) ("We cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."); *Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *10 (N.D. Ill. Jan. 7, 2020); *Pierrelouis*, 2019 WL 5208867, at *7 (that aspect of business is "vital" does not, standing alone, create a strong inference of scienter).

Indeed, Plaintiffs' allegations here are particularly ill-suited to permit such an inference as they are wholly lacking in particulars. For example, Plaintiffs emphasize the customer losses announced in January and February 2019. (CC ¶¶ 84, 92.) But the Complaint does not contain a single particularized fact indicating those losses were knowable at the time of the last alleged

---

[9] Relatedly, executives' Sarbanes-Oxley certifications (CC ¶ 140 n.6) do not create a strong inference of scienter. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018); *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015); *Roth*, 527 F. Supp. 2d at 804.

misstatement on November 7, 2018. Consistent with PBM sales being weighted toward year end, the far more plausible inference is that the Defendants learned of those losses after November 7, 2018. Plaintiffs also fail to allege the scope, duration, and extent of any integration issues or the level of management to which they would have arisen. *Cf. Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008) ("Someone low in the corporate hierarchy might make a mistake that formed the premise of a statement made at the executive level by someone who was at worst careless in having failed to catch the mistake."). And nothing is alleged about ICFR beyond what Diplomat itself disclosed, such as how and why the issues arose. These are the sort of "omissions and ambiguities" that "count against inferring scienter." *Tellabs*, 551 U.S. at 310.

*Scope And Severity.* Next, Plaintiffs argue that the service failures relating to integration of the PBM business and the resulting loss of clients were so severe that Defendants must have known or recklessly disregarded the truth. (*See* CC ¶¶ 124, 129–32.) Not so. As mentioned above, the Complaint is lacking in particulars regarding the alleged service failures and known or anticipated customer losses *at the time the alleged misstatements were made*. All Plaintiffs allege—based on the Defendants' own 2019 disclosures—is that customer service issues did arise and ultimately caused customer losses. (CC ¶¶ 84, 92, 107.) That attempt to argue fraud by hindsight does not suffice. *See, e.g.*, *Anderson*, 827 F.3d at 1251 (scienter claims based on "magnitude of the loss" "amount to allegations of 'fraud by hindsight'"); *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010).

*Accounting Policies.* Plaintiffs' reliance on the Company's goodwill accounting policies (CC ¶¶ 137–42) suffers from similar deficiencies. The Complaint alleges that, under GAAP and the Company's accounting policy, the Company reviewed goodwill for impairment "annually during the fourth quarter of each year" and more often if circumstances required. (CC ¶¶ 138–

22

39.) Plaintiffs suggest this review would have resulted in the Individual Defendants learning about the impact of customer losses on the PBM business's value at the time of the alleged misstatements. This position simply begs the question of when the impact of customer losses was known or knowable, a question that the Complaint does not answer. No impairment review could have revealed the impact of customer losses that had not yet materialized.[10]

*Motive.* To demonstrate motive, "a plaintiff must assert that the defendant 'benefitted in some concrete and personal way from the purported fraud.'" *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 933–34 (N.D. Ill. 2019) (citation omitted). Plaintiffs fail to do so. For example, none of the Individual Defendants is alleged to have made any suspicious stock sales during the Class Period—undercutting any inference of scienter. *See Pugh*, 521 F.3d at 695 ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of [the company]'s stock fell."); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) ("[T]he absence of inside sales dulls allegations of fraudulent motive."). So too does the timing of the alleged fraud. Plaintiffs claim Defendants began perpetrating a fraud in late February 2018, only to start voluntarily unraveling it by way of corrective disclosures before year-end. That makes little sense. *Zimmer Holdings*, 679 F.3d at 956 ("Managers usually do best when a firm has long-term success. Those who boost prices fraudulently for [a few] months … and then see market capitalization decline, may find themselves on the street….").

---

[10] Moreover, the fact that the Company would conduct this review "during the fourth quarter" does not mean it would *complete* its review "before November 7"—*i.e.*, before the last alleged misstatement. (CC ¶ 142.) And Plaintiffs fail to explain why "the service disruptions and customer complaints occurring in 2018" would have "trigger[ed]" a mid-year impairment review (CC ¶ 140–41) under GAAP or the policy.

23

Indeed, Plaintiffs' allegations as to motive are common across the industry. Plaintiffs allege that because Diplomat operated in a highly acquisitive industry, the Individual Defendants were motivated to fraudulently inflate the Company's stock price to "more cheaply acquire other companies" and make Diplomat itself a more "attractive acquisition target." (CC ¶¶ 143–48.) That is the sort of generalized motive that adds nothing to the scienter calculus. *Kohl's*, 895 F.3d at 939–40; s*ee, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("Such generalized desires fail to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired or to acquire another." (quotation omitted)); *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at \*9 (N.D. Ill. July 12, 2006).

***Executive Departures.*** Finally, Plaintiffs' reliance on executive departures (CC ¶¶ 133–36) also fails.[11] For "corporate departures to strengthen an inference of scienter, there must be particularized allegations connecting the departures to the alleged fraud." *In re Hertz Glob. Holdings Inc*., 905 F.3d 106, 118 (3d Cir. 2018). Put differently, Plaintiffs "must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009). Plaintiffs fail to do so. The Complaint highlights the timing of the departures—soon after the Company was informed of and disclosed additional PBM customer losses. (CC ¶¶ 133–35.) But that is entirely consistent with a struggling company attempting to improve its fortunes. *Hertz*, 905 F.3d at 119 ("[c]hanges in leadership are only to be expected" following bad news); *M & M*, 2017 WL 5635424, at \*13 (timing of executives' departures not indicative of scienter where it "more readily support[s] an

---

[11] Plaintiffs cite the departures of Messrs. Saban, Park, and Kavthekar, as well as CastiaRx's former COO, Albert Thigpen. (CC ¶ 133–36.) But Mr. Thigpen is not named as a defendant in this lawsuit, and Plaintiffs do not explain how his departure supports a strong inference of scienter against any of the Individual Defendants.

24

inference that they were [pushed] out for mismanaging the … acquisition"). In short, the Complaint includes no particularized facts indicating these departures "resulted from the relevant executives' knowing or reckless involvement in a fraud." *Hertz*, 905 F.3d at 119.

*     *     *

Plaintiffs' allegations, whether considered individually or holistically, do not give rise to a strong inference that any of the Defendants acted fraudulently with regard to any statement at issue. The far more compelling inference is that the Company entered into a new and highly competitive business, lost customers and struggled to win new business during its compressed 2019 PBM selling season, and disclosed those losses as well as ICFR deficiencies as they became known at the end of 2018 and into 2019. The absence of facts creating a strong inference of scienter also requires dismissal of the Complaint.

## III.    Plaintiffs Do Not State A Claim For Control Person Liability Under Section 20(a).

Plaintiffs' claim for control person liability under Section 20(a) must be dismissed because the Complaint fails to adequately allege the requisite primary violation of the securities laws, *i.e.*, of Section 10(b). *Kohl's*, 895 F.3d at 936; *Pugh*, 521 F.3d at 698.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

25

Dated: February 7, 2020

Respectfully submitted,

*/s/ James W. Ducayet*

James W. Ducayet (IL Bar # 6236997)
Nilofer I. Umar (IL Bar # 6297810)
Nicholas K. Tygesson (IL Bar # 6314168)
Andrew F. Rodheim (IL Bar # 6327514)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
jducayet@sidley.com
numar@sidley.com
ntygesson@sidley.com
arodheim@sidley.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2020, I electronically filed the foregoing document and accompanying exhibits with the Clerk of the Court using CM/ECF. I certify that the foregoing document and accompanying exhibits are being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Nicholas K. Tygesson*

Nicholas K. Tygesson
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
ntygesson@sidley.com

*Counsel for Defendants*