UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| CHASE MORTIMER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:19-cv-01735 **(Consolidated)** |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | Honorable John F. Kness |
| DIPLOMAT PHARMACY, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED COMPLAINT

Cases\4850-7820-1272.v1-6/23/20

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...............................................................................................1

II. FACTUAL BACKGROUND ...........................................................................4

    A. Pre-Class Period Events .........................................................................4

    B. Class Period Events .................................................................................5

    C. Class Period False Statements .................................................................6

    D. The Truth Is Revealed .............................................................................6

III. ARGUMENT .....................................................................................................7

    A. Legal Standards Regarding Motions to Dismiss Securities Claims .........7

    B. The Complaint Adequately Alleges False and Misleading Statements ...8

        1. Legal Standards for Pleading Falsity ...........................................8

        2. False and Misleading Customer Satisfaction and Gains Statements ...........9

        3. False and Misleading Customer Relationship Statements .........................10

        4. False and Misleading Statements Minimizing Customer Losses .............10

        5. Misleading Synergy Statements .................................................11

        6. Defendants' Arguments Are Unavailing .....................................12

            a. The Statements Were Not Vague or Puffery ...............................12

            b. Defendants' Half-Truths Were Misleading .................................14

            c. Defendants Did Not Offset the Misleading Nature of the Challenged Statements Through Other Statements .......................15

            d. Defendants' Timing Argument Fails ...........................................16

    C. The Totality of Factors Supports a Strong Inference of Scienter ...........17

        1. Defendants Had Motive to Conceal the Negative Trends .........................18

        2. Defendants' False Statements, Senior Positions, and Personal Involvement Contribute to a Strong Inference of Scienter .......................19

        3. The Core Operations Doctrine Supports an Inference of Scienter ...........20

Cases\4850-7820-1272.v1-6/23/20

## TABLE OF CONTENTS

**Page**

4.    The Severity of the PBM Collapse Supports Scienter ..............................22

5.    Executive Departures Support a Strong Inference of Scienter ..................22

6.    Defendants' Obligations Under GAAP Support Scienter .........................23

7.    Defendants' Arguments Lack Merit ..........................................................23

IV.    CONCLUSION ...................................................................................................25

- ii -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ..................................................................................24

*Ala. Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)........................................................................................12

*Asher v. Baxter Int'l, Inc.*,
2005 WL 331572 (N.D. Ill. Feb. 3, 2005) ...............................................................21

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) .....................................................................................12

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................15, 22

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ................................................... *passim*

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ..............................................................8, 20

*Danis v. USN Commc'ns, Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999) ...........................................................................18

*Dardick v. Zimmerman*,
149 F. Supp. 2d 986 (N.D. Ill. 2001) .........................................................................21

*Desai v. Gen. Growth Prop., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .........................................................................20

*Fugman v. Aprogenex, Inc.*,
961 F. Supp. 1190 (N.D. Ill. 1997) ............................................................................24

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008).........................................................................23

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ....................................................................16, 23

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) .........................................................................13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).........................................................................23

Cases\4850-7820-1272.v1-6/23/20

# TABLE OF CONTENTS

**Page**

*In re First Chi. Corp. Sec. Litig.*,
769 F. Supp. 1444 (N.D. Ill. 1991) ........................................................................13

*In re InfoSonics Corp. Sec. Litig.*,
2007 WL 2301757 (S.D. Cal. Aug. 7, 2007) ..........................................................14

*In re Motorola Sec. Litig.*,
2004 WL 2032769 (N.D. Ill. Sept. 10, 2004) .........................................................20

*In re Neopharm, Inc. Sec. Litig.*,
2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ..............................................................13

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................14

*In re Sears, Roebuck and Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) ...............................................................14, 20

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*,
604 F. Supp. 2d 1188 (N.D. Ill. 2009) .............................................................12, 21

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)....................................................................................18

*Kelsey v. Allin*,
2016 WL 825236 (N.D. Ill. Mar. 2, 2016)..............................................................24

*Kurtzman v. Compaq Comput. Corp.*,
2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)......................................................23

*Lindelow v. Hill*,
2001 WL 830956 (N.D. Ill. July 20, 2001)...........................................13, 15, 16, 21

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..................................................................................14

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006),
*rev'd in part on other grounds*,
551 U.S. 308 (2007)................................................................................3, 4, 5, 19

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ........................................................................ *passim*

*Manavazian v. ATEC Grp., Inc.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) ....................................................................14

Cases\4850-7820-1272.v1-6/23/20

## TABLE OF CONTENTS

**Page**

*Norfolk Co. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)..............................................................................18

*Pirraglia v. Novell, Inc.*,
339 F.3d 1182 (10th Cir. 2003) ....................................................................................15, 16

*Plumbers and Pipefitters Local Union No. 630*
*Pension-Annuity Tr. Fund v.*
*Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ...........................................................................8, 12, 17

*Rehm v. Eagle Fin. Corp.*,
954 F. Supp. 1246 (N.D. Ill. 1997) ...................................................................................22

*Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...................................................................1, 18, 19

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)........................................................... *passim*

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)................................................................................................18

*Rubinstein v. Gonzalez*,
241 F. Supp. 3d 841 (N.D. Ill. 2017) ...............................................................................24

*Schaffer v. Timberland Co.*,
924 F. Supp. 1298 (D.N.H. 1996)....................................................................................14

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007) ..............................................................................19

*Schlifke v. Seafirst Corp.*,
866 F.2d 935 (7th Cir. 1989) ...........................................................................................14

*Silverman v. Motorola, Inc.*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ...............................................................17, 21

*Silverman v. Motorola, Inc.*,
798 F. Supp. 2d 954 (N.D. Ill. 2011) ..................................................................................7

*Takara Tr. v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) ............................................................................12, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................3, 7, 17, 18

Cases\4850-7820-1272.v1-6/23/20

## TABLE OF CONTENTS

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ................................................................................................................................7, 8
    §78u-4 ..........................................................................................................................1, 18, 24

Federal Rules of Civil Procedure
    Rule 9(b) ...........................................................................................................................18

Cases\4850-7820-1272.v1-6/23/20

## I. INTRODUCTION

Defendants suggest the PSLRA raised the pleading standard for securities fraud cases so high that it could never be met. But many securities fraud cases survive a motion to dismiss because the PSLRA did not change that "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*").[1] Ignoring this, defendants dispute the allegations by attaching 24 exhibits to their motion to dismiss and asking the Court to draw inferences in their favor as they argue for innocent interpretations of their statements and intent.[2] Equally meritless is defendants' claim that this case is based on "hindsight" disagreements with management decisions that turned out poorly. Defendants were free to make bad decisions that brought a Company with a forty-year history of success to the verge of bankruptcy, but the securities laws were passed to hold them accountable for misrepresenting and concealing the negative impacts of those decisions.

Diplomat was a specialty pharmacy that acquired two PBMs for $647 million in the largest transaction in company history. ¶¶35, 40, 45. The acquired PBMs, NPS and LDI, were smaller companies that competed by offering exceptional service rather than lowest price. ¶39. Diplomat's co-founder, Hagerman, saw that the industry was consolidating as customer preference shifted toward competitors that could offer both specialty pharmacy and PBM services. ¶¶40-45. Among other things, to maintain high service and customer relationships, Diplomat said it would retain key PBM employees and use NPS's proprietary claims processing platform. ¶¶48-50.

---

[1] All capitalized terms used in this opposition that are not otherwise defined herein have the same meaning as set forth in the Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 82) (the "Complaint"). All "¶__" and "¶¶__" references are to the Complaint. Additionally, all emphasis is added and citations omitted unless noted.

[2] For example, at least five of defendants' exhibits (L, O, Q, R, and S) are not even referenced in the Complaint. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *10-*15 (N.D. Ill. Feb. 13, 2013) (refusing to consider proxy statements, SEC filings, and FDA reports attached to defendants' motion to dismiss securities fraud complaint).

However, shortly after the acquisition, Hagerman stepped down as CEO, and when defendants took control they shifted from a focus on growing revenues to cutting costs. ¶51. Defendants terminated legacy employees from NPS and LDI, and migrated NPS customers over to LDI's claims processing platform. ¶¶52-53. As NPS customers (who previously chose NPS over other options like LDI) were forced over to LDI's platform, many chose to leave rather than transition. ¶53. The risk that customers would choose a competitor instead of transitioning to LDI was exacerbated by service failures and disruptions during the migration. ¶¶54-56. The decision to terminate legacy employees with good customer relationships only made matters worse. *Id.* The result was nearly the complete collapse of the PBM business, and with it the loss of cross-selling opportunities that were going to help pay down the expensive acquisition. ¶¶53, 108.

The claims in this case seek to recover damages for shareholders that purchased Diplomat common stock at inflated prices due to defendants' false and misleading statements that portrayed the acquisition and integration as a success that was growing the PBM business while concealing and omitting to disclose the employee terminations, service failures, and customer dissatisfaction and losses that were actually causing the business to collapse. For example, defendants reassured investors that they were "*extremely pleased*" with "*the actual conversations*" they were having with PBM clients (¶65(i)), claimed the process of "*taking 2 legacy PBMs and . . . putting them on to a single platform . . . has been going extremely well*" (¶69(b)), asserted that their client "*retention rate is typical, if not a little bit better than most PBMs*" (¶73(i)), and bragged that new business "*[p]roposal volume for the month of July was approximately double what we saw a year ago*" (¶65(d)) and that they were "*seeing some early new client wins*" (¶73(e)).

These were not vague expressions of optimism as defendants now claim, but misleading statements that created the false impression that Diplomat was winning new customers in the PBM space and retaining existing customers at a rate "better than most," and that their NPS customers

- 2 -

were extremely satisfied with the transition to the LDI platform. Investors were excited with the purported success, and analysts commented favorably that "[t]he integration and synergy capture process is ahead of schedule, client interest in the specialty-oriented PBM offering is reportedly high, and management noted that selling season requests for proposal volume is running double year-ago levels." ¶66. In truth, as revealed at the end of the Class Period, none of these statements were true. More specifically, the decision to terminate legacy employees and the migration failures were causing service levels to sink and customer complaints to rise, leading to massive customer losses. ¶¶51-56. Far from winning new customers and having a "better than most" retention rate for existing customers, customers were fleeing as soon as their contracts came up for renewal and most of the PBM business was lost. ¶¶85, 92, 100-101, 106.

At the end of the Class Period, as the massive losses hit the bottom line, defendants were forced to admit the massive customer losses were due to "service issues [that were] connected to that transition process" from NPS to LDI (¶100), and that "'there is no question that this segment [the PBM business] disappointed in 2018'" (¶85). Defendants' current claim that they accurately reported on the PBM integration during the Class Period is belied by the fact that Diplomat's common stock, which investors had been buying as high as $28 per share during the Class Period, crashed to roughly $3 per share when the true state of affairs was revealed. ¶¶150, 157.

This lawsuit follows because the Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). As the Seventh Circuit has stated, "the modern securities laws were designed . . . to 'substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), *rev'd in part on other grounds*, 551

Cases\4850-7820-1272.v1-6/23/20

U.S. 308 (2007) ("*Tellabs I*"). Here, the Complaint adequately alleges that defendants' conduct fell far short of the "'full disclosure'" consistent with a "'high standard of business ethics'" that was required, so their motion to dismiss should be denied. *Id*.

## II. FACTUAL BACKGROUND

### A. Pre-Class Period Events

Specialty pharmacies fill and deliver high-cost, low-volume products that require special care in handling or administration, which retail and mail-order pharmacies are ill-equipped to handle. Such products include injectable (*i.e.*, by needle and syringe), infusible (*i.e.*, by IV drip), or inhalable medications. ¶35. Diplomat was the largest independent specialty pharmacy in the United States and filled prescriptions for patients then got paid by submitting a claim to the payer (*e.g.*, the patient's employer-sponsored insurer or Medicare). ¶32. NPS and LDI were PBMs that were hired by certain payers, such as self-insured employers or unions, to administer their pharmaceutical drug plan benefits, including negotiating rebates with manufacturers and establishing lists of approved drugs. ¶¶32-37. To track the paperwork through the system of claim approval, billing, explanation of benefits, and collection of payments, PBMs use claims processing systems, which are selling points based on their ease of use, reliability, security, and speed. ¶36.

Diplomat grew in its first year as a public company, with 2015 revenues increasing from $2.2 to $3.4 billion, and EBITDA increasing from $35 to $95 million. ¶¶4 n.1, 41. In 2016 and 2017, Diplomat's growth slowed due to a shift in customer preferences as PBMs began to acquire specialty pharmacies to offer combined services. ¶42. Diplomat began to lose contracts to bundled service providers, with Hagerman explaining, for example, they could not compete and lost a large contract "because they're asking us for things that we did not have." *Id*. In response, Hagerman decided that Diplomat should acquire a PBM business so it could also offer bundled services. ¶43.

Cases\4850-7820-1272.v1-6/23/20

Thereafter, Diplomat engaged in the largest acquisitions in its history, paying $647 million to acquire NPS and LDI. ¶¶44-45. Diplomat described the keys to success, noting the need to provide exceptional service, retain legacy management and sales forces from NPS and LDI to keep customers and cross-sell its specialty pharmacy services to those customers, and use NPS's "proprietary" claims processing system to implement the new PBM bundled services. ¶¶46-50.

### B. Class Period Events

After Hagerman led the effort to acquire the PBM business, he retired. ¶115. Defendant Park became the Interim CEO until replaced by defendant Griffin as CEO. *Id*. Defendants Park and Griffin, along with defendant Saban (Diplomat's President) and defendant Kavthekar (Diplomat's CFO and Treasurer), changed course to focus on cutting costs. *E.g.*, ¶¶51, 63(b).

Defendants began integrating the PBM business in January 2018. ¶51. By no later than February 2018, they began terminating legacy employees from NPS and LDI, and thereafter customer complaints started to increase due to poor service and unreturned calls. *See, e.g.*, ¶¶52-55, 85-87, 90, 92, 96. Next, Diplomat abandoned NPS's claims system and migrated those customers over to the third-party system used by LDI. ¶¶100-101. By April, the PBM businesses were operating under a new brand, CastiaRx. ¶73(d). The migration to LDI caused more service failures, and customer frustration was compounded by the terminations of legacy employees. *See, e.g.*, ¶¶52-55. By May 2018, Diplomat began losing customers as they declined to renew their contracts and fled to competitors. ¶60(c). By summer, Diplomat brought in consultants to help with the service declines. ¶¶58(a)-(c), 85, 92, 101, 104, 123. The negative trend of increased customer complaints and non-renewals continued at a dramatic pace throughout 2018 and 2019, with the PBM business shrinking by 25% in the first year of the acquisition (2018) and the majority of the business gone by November 2019. ¶¶80, 106, 129. The service issues were never fixed because as late as November 2019 defendants admitted they were still losing customers, and lenders might foreclose on their

- 5 -

assets. ¶108. Diplomat's stock price, after trading as high as $28 per share during the Class Period, collapsed to $3 per share. ¶¶150, 157.

### C. Class Period False Statements

Due to defendants' decisions to terminate legacy employees with client relationships and migrate NPS customers over to LDI's system, customer complaints spiked, customer losses increased, and rather than increasing revenues through cross-selling, PBM customers were fleeing. During the Class Period, instead of disclosing their decisions to terminate employees and cut costs, the increased risks of customer loss from the decisions to focus on cost cutting and abandoning the NPS system, and the negative impact and trends from those decisions (mounting service failures and customer losses), defendants concealed them through false and misleading statements touting customer satisfaction, high customer retention, and new client wins. *See infra*, III.B.

Analysts reacted positively to the false and misleading statements during the Class Period by commenting that they "were reassured by the integration progress, stability of operations, and reported favorable reception from benefit consultants" (¶62), and "[t]he integration and synergy capture process is ahead of schedule, client interest in the specialty-oriented PBM offering is reportedly high, and management noted that selling season requests for proposal volume is running double year-ago levels" (¶66). *See also* ¶¶62, 70 (similar positive assessments). As a result, Diplomat's stock traded at artificially inflated prices.

### D. The Truth Is Revealed

Starting in November 2018, and continuing through November 2019, as Diplomat had to report its audited financial results, the truth came out in a series of disclosures revealing that the failure to retain key PBM employees and the decision to transition from NPS's proprietary claims software caused service-level declines, increased customer complaints, and lost business, pushing

Diplomat to the brink of bankruptcy. ¶¶79-109.[3] Contrary to their optimistic assessments during the Class Period, analysts expressed shock at these revelations and commented that "client losses were largely due to the loss of legacy NPS clients, partly due to the loss of relationships when NPS [management] wasn't retained post-merger as well as some service issues" (¶86); "the company did not retain the NPS management team, and when the company went through the conversion to the [new] platform, that provided an opportunity for some customers to put their business out to bid, and the company was unable to complete some of those renewals" (¶87); and "we believe the challenges in the PBM business are likely insurmountable at this point" (¶97).

## III. ARGUMENT

In order to state a claim under SEC Rule 10b-5, plaintiffs must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 958-59 (N.D. Ill. 2011). In moving to dismiss, defendants have challenged only the first two elements, conceding that the other elements were adequately pled.

### A. Legal Standards Regarding Motions to Dismiss Securities Claims

In considering a motion to dismiss a securities fraud case, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Tellabs III*, 513 F.3d at 705. Moreover, the court must not parse the allegations for individual analysis, but "consider the complaint in its entirety" to determine if the claims are sufficient. *Tellabs II*, 551 U.S. at 322.

---

[3] The specific corrective disclosures are set forth in ¶80 (Nov. 6, 2018); ¶84 (Jan. 7, 2019); ¶91 (Feb. 22, 2019); and ¶¶105-108 (Nov. 12, 2019).

### B.     The Complaint Adequately Alleges False and Misleading Statements

### 1.     Legal Standards for Pleading Falsity

The Complaint need only allege a statement was false *or* misleading.  *See, e.g.*, *Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 879 (N.D. Ill. 2011) (holding that statement was misleading even though it was not false).  This distinction is important because "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at \*6 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.).

On a motion to dismiss, the Court need not conclusively "determine whether [defendants'] statements were in fact misleading, rather this Court need only determine that plaintiffs have alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud." *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at \*3 (N.D. Ill. Jan. 23, 2012).[4]  If the court finds that plaintiffs have alleged any false or misleading statement by each defendant, this element of a §10(b) claim has been met, and the court need not rule on all statements.  *See, e.g.*, *Ross*, 2012 WL 5363431, at \*8 (holding "because plaintiffs have, by the allegations already discussed, met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category" of false statements); *Lakeland*, 2012 WL 607578, at \*2-\*3 (denying motion to dismiss and addressing categories of statements rather than each individual statement).  Applying these standards to the Complaint, it adequately alleges false and misleading statements by each defendant.

---

[4]     Defendants attempt to overstate the standard for pleading falsity by citing *Pierrelouis v. Gogo, Inc.*, but ignore that case also says plaintiffs need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  414 F. Supp. 3d 1164, 1173 (N.D. Ill. 2019).

- 8 -

### 2. False and Misleading Customer Satisfaction and Gains Statements

The Complaint identifies the specific statements, the date and defendant who made them, and the reasons they are alleged to be false and misleading.[5] For example, defendants made false and misleading statements regarding customer satisfaction and new customer gains that included:

- Defendant Griffin claimed "*[f]eedback from consultants, clients and prospective clients since the launch of CastiaRx [the rebranded PBM business] has been positive, and interest in the CastiaRx offering is quite high*. We are in the middle of the busiest part of the 2019 selling season" and, "*[p]roposal volume for the month of July was approximately double what we saw a year ago. In the small- to middle-market, no one has our clinical and specialty services strength. That is what differentiates us*." ¶65(d);

- Defendant Park claimed "*[o]ur integration is off to a strong start*" and "*we have brought to market our suite of specialty pharmacy and infusion services to our new small and middle market PBM clients. This is being well received in our initial discussions with clients and consultants . . . .*" ¶58(a);

- Defendant Saban claimed "*we're extremely pleased with not only the activity of the RFPs, but also with the actual conversations that we're having with the plans*" and "*we're extremely pleased with not only as I said the RFP activity, but also with the response that we've been getting from the consultants and the clients that we presented to*." ¶65(i);

- Griffin said "*[w]e continue to see strong interest in CastiaRx's solutions since we launched the brand on April 30, observing significantly higher RFP activity compared to last year*" and "*we've been awarded new client contrsacts in the third quarter*." ¶73(d); and

- Kavthekar claimed Diplomat was "*seeing strong interest in CastiaRx's solutions, and we are seeing some early new client wins*. At the same time, *we are also renewing clients at current market rates*." ¶73(e).

These statements were false and misleading because any positive feedback, increased proposal volume, or customer wins were far outweighed by the negative trends of increased customer complaints and losses due to the service level declines arising from employee terminations, cost cutting, and transition away from NPS's platform. *See supra*, II.B, II.D.

---

[5]    Defendants break the statements into two groups – internal controls and PBM integration, but this opposition separates the latter group into the categories identified herein. The additional false and misleading statements in each category are reflected in Exhibit A, attached hereto.

### 3. False and Misleading Customer Relationship Statements

Adding to the misleading impression that customers were satisfied and increasing in number, defendants claimed client relationships were very strong, which concealed the legacy employee departures that were negatively impacting service levels. For example:

- Defendant Park, in responding to question of why the PBMs were acquired, said "*[w]hen you look at what we see in NPS and with LDI, individually, they're unique in the relationships they have with their clients, both have long durable relationships with their customers. That is a huge value proposition*, both – the big part of the value for each of those companies." ¶58(d);

- Defendant Kavthekar, regarding PBM integration, claimed "*I continue to be quite pleased with the progress our new leaders and various teams have made*" in "building stronger relationships with our clients." ¶58(b); and

- Defendant Saban, with regard to the PBM integration claimed "*[w]e're off to a very strong start, ensuring our patient and client experiences are strong*" and "*I would personally like to recognize the Diplomat and CastiaRx teams for their hard work and dedication to high customer service and operational excellence*." ¶60(b).

These statements were misleading because, as analysts uncovered at the end of the Class Period, they concealed the termination of legacy employees and its negative impact on service levels. ¶¶86-87, 90. Contrary to these statements claiming employees built "stronger relationships" with the PBM clients, Griffin later admitted that Diplomat "fielded a professional, experienced sales organization that, candidly, we didn't have in the company a year ago." ¶104.

### 4. False and Misleading Statements Minimizing Customer Losses

Defendants also made misleading statements regarding the significance and reasons for customer losses. For example, defendant Saban, with regard to customer retention, claimed "*our retention rate is typical, if not a little bit better than most PBMs*" (¶73(i)), and in disclosing some anticipated customer losses, defendant Kavthekar minimized the negative impact, claiming they expected "*a few small and low-margin clients [to] exit the legacy [NPS] business*" and that "*[w]e are not talking about anything overly meaningful*" (¶¶60(c), 68(b)). As for why customers were

leaving, defendant Griffin dismissed the customer losses as being for "one-off" reasons, claiming that on a "***move forward basis . . . we're very well-positioned to win, again, both in commercial and Med D into the future. So I would look at them [the customer losses] as a one-off***" (¶73(g)).

These statements were misleading because losing 25% of the PBM business in the first year was meaningful, their client retention rate was much worse than most PBMs, and the service failures created a negative trend of customer losses as contracts came up for non-renewal, which continued from 2018 through 2019. *See supra*, II.B. Moreover, the losses were not for "one-off" reasons but were part of the systemic service declines, as defendants later admitted. *See supra*, II.D. Leaving no doubt about defendants' intention to mislead investors about the direction of the PBM business, in May 2018, at the same time defendant Kavthekar minimized the client losses as "small and low-margin," the Company increased its revenue and profit guidance for the year. ¶59.

### 5.  Misleading Synergy Statements

Defendants made misleadingly positive statements about cost savings ("synergies") from the PBM integration, which contributed to the misleading impression that the integration was increasing profitability. For example, defendant Griffin stated in August 2018 "***[o]ur results were driven by strong execution of the CastiaRx integration of the NPS and LDI, PBM businesses, and their outperformance against expected synergies***" and "***[s]ynergies are being driven by improvements on . . . PBM services***." ¶¶65(a)-(b).

These statements reinforced the misleading impression that the PBM acquisition and integration was increasing profitability, while concealing from investors that the cost savings were not nearly enough to offset the lost revenues from customer losses. *See supra*, II.B.

- 11 -

### 6. Defendants' Arguments Are Unavailing

#### a. The Statements Were Not Vague or Puffery

This argument is premature for a motion to dismiss because courts have held that the "the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 976 (N.D. Ill. 2006); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (finding question of materiality inappropriate at pleading stage). Other courts addressing the issue at this stage have looked to the stock price drop, which in this case went from $28 to $3 per share, as sufficient to show the statements were material to investors. *See In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009) (holding "[t]he fact that the price of the stock plummeted shortly after disclosure demonstrates" the materiality of concealed information); *see also Ala. Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (finding "the materiality of the alleged misrepresentations [was] self-evident when we look at the market's negative reaction" when the truth was disclosed).

Here, the stock price drop is sufficient to demonstrate materiality, and defendants cannot escape this by cherry-picking a few words (*e.g.*, "going well") and removing them from context to claim the statements were vague expressions of corporate optimism. Considered in context, each statement contributed to the misleading impression that the PBM business was on a positive trajectory, when in fact it was in a free fall. Defendants' statements about being "extremely pleased" with customer conversations, or the integration being off to a "strong start" or "going well," were overly rosy assessments that concealed the negative trends of service failures and customer complaints and non-renewals. *See Allscripts*, 778 F. Supp. 2d at 879-80 (holding statement that "'rollout [was] going very well'" was actionable because "[w]hile the precise meaning of portions of this statement is unclear, what is clear is that a reasonable investor could have been misled by this

- 12 -

statement" because it "may have misled a reasonable investor into developing an overly rosy picture of the risks and the resulting problems Allscripts was facing" in product integration); *Lindelow v. Hill*, 2001 WL 830956, at *2 (N.D. Ill. July 20, 2001) (Holderman, J.) (finding statement that """"[w]e are very excited about, and are getting ready for, our controlled market launch"""" was misleading).

Statements like things were "going well" were not vague because they were supported with specific factors for the purportedly positive trends such as customer feedback (*e.g.*, ¶¶65(d), 66), NPS migration to LDI (*e.g.*, ¶69(a)), increased proposal volume (*e.g.*, ¶66), new client wins (*e.g.*, ¶73(e)), and stronger client relationships (*e.g.*, ¶58(b)). *See In re First Chi. Corp. Sec. Litig.*, 769 F. Supp. 1444, 1452 (N.D. Ill. 1991) (holding where defendant accompanied optimistic statements with "explanations of the sources of the corporation's strength," statements were not immaterial); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 331-32 (D. Mass. 2002) (holding statement that new product "was fueling growth" was not puffery because it was a "precise statement as to the basis for profit growth"). Moreover, the statements are not puffery because they omitted negative facts and trends, such as the service failures, employee terminations, and customer complaints and non-renewals. *See Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *4 (N.D. Ill. Feb. 27, 2018) (rejecting vagueness argument because "[e]ven if a reasonable investor understood defendants' conclusions to be uncertain, that understanding would have been based on incomplete information" due to the omitted facts); *see also In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (finding statements about drug's performance in clinical trials were misleading because they "downplayed" the problems).

The cases defendants rely on are distinguishable because statements that may be puffery in one case may be material in another because they "cannot be taken out of context" and "if these statements reinforce factual misstatements and therefore contribute to ongoing deception, they may

- 13 -

become actionable." *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003); *Ross*, 2012 WL 5363431, at *7 (stating the "Court must take into account the context in which the statements were made to determine whether they amounted only to puffery").[6] Thus, the statements were material and not puffery.

### b. Defendants' Half-Truths Were Misleading

Defendants next argue that some statements regarding cost-saving synergies, increased RFP activity, or select positive feedback were literally true. Defendants' Motion to Dismiss the Consolidated Complaint (ECF No. 91) ("Br.") at 12-14. But "[o]nce the defendants engaged in public discussions" of the PBM business "they had a duty to disclose a 'mix of information' that is not misleading." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009). In other words, one-sided positive assessments "even if literally true, could still be misleading to investors depending on the context and manner of their presentation." *See, e.g.*, *Ross*, 2012 WL 5363431, at *6; *see also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (stating "incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements").

Defendants are wrong to suggest the statements must be proven false (*e.g.*, there was zero positive customer feedback, zero cost savings, and RFP proposal volume did not increase) because it is sufficient that they be misleading due to omissions of the negative trends (*e.g.*, increased customer

---

[6] *See Tellabs III*, 513 F.3d at 706-07 (upholding statements including: "growth was 'robust' and that 'customers are embracing'" new product; sales are "'still going strong'"; "'we are satisfying very strong demand and growing customer demand'"; and "'we are as confident as ever'"); *In re InfoSonics Corp. Sec. Litig.*, 2007 WL 2301757, at *6 (S.D. Cal. Aug. 7, 2007) (statement that product was "'well received'" was material); *Schaffer v. Timberland Co.*, 924 F. Supp. 1298, 1314 (D.N.H. 1996) (statement that "'brand remains very strong'" held actionable); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (statement that we believe we are "'a very solid company'" was actionable because it was made concurrently with assertion that "'[w]e're one of the most financially secure [companies] anywhere on the planet'"); *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 480 (E.D.N.Y. 2001) (statement that company was "'poised for future growth'" was actionable where omitted facts undermined accuracy of the statement).

complaints, service failures, and non-renewals) that were far outpacing any positives and leading to the collapse of the PBM business. *See, e.g.*, *Lindelow*, 2001 WL 830956, at \*2-\*3 (holding statement that CEO was """very excited about""" website launch was actionable because even "[t]hough some statements complained of by plaintiffs could be read as literally accurate, plaintiffs have sufficiently alleged that the statements were misleading in context").

As a further example, it was misleading to highlight the unique and close relationships the PBMs had with their clients and to claim customer relationships were getting "stronger" after the acquisition (¶¶58(b)-(d)), while concealing that legacy employees who built those relationships were being let go and service levels were declining, with customers unable to get phone calls returned (¶¶52-55). *See Allstate*, 2018 WL 1071442, at \*3 (holding "[d]efendants' failure to mention Allstate's reduction in underwriting standards" made statements that defendants were not "'concerned that [a spike in claims] was a quality issue'" misleading).

### c. Defendants Did Not Offset the Misleading Nature of the Challenged Statements Through Other Statements

Defendants' attempt to argue innocent interpretations of their statements, or that certain disclosures, such as customer losses, rendered their statements not misleading, is premature at this stage because all inferences must be drawn in favor of the non-movant. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (reversing dismissal of complaint and rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one"); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1193-94 (10th Cir. 2003) ("At this stage, it is not our role to evaluate the accuracy of plaintiffs' well-pleaded facts . . . .").

Here, defendants' statements regarding customer losses were misleading because they characterized them as "small," "low margin," and not "overly meaningful." *See supra*, III.B.4. In

- 15 -

addition, they blamed the losses on "one-off" reasons but omitted to disclose that service declines from employee terminations and migration were increasing customer complaints in a business that depended on offering exceptional service. *Id.*; *see In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814 (N.D. Ill. 2017) (rejecting argument that risk warnings rendered statements not misleading because "'a misleading statement will not always lose its deceptive edge simply by joinder with others that are true'"); *Allstate*, 2018 WL 1071442, at *4 (rejecting argument based on statements, "some of which were conflicting," because it "misses the point" that "[e]ven if a reasonable investor understood defendants' conclusions to be uncertain, that understanding would have been based on incomplete information" because of the omitted facts); *Lindelow*, 2001 WL 830956, at *3 ("the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").

### d. Defendants' Timing Argument Fails

Defendants' argument that their statements were not false when made is dependent on challenging, rather than accepting, the allegations in the Complaint. For example, defendants claim the selling season was at the very end of 2018 so they could not have known of the customer losses and non-renewals until 2019. Br. at 13-14. But their current claim is contrary to their Class Period statements that they were losing customers in May 2018 (¶60(c)), that in August 2018 (the middle of the year) they were in the "middle" (not beginning) of the busiest part of the selling season (¶65(d)), and that in November 2018 their renewal rate was "a bit better" than most PBMs (¶73(i)).

Similarly, defendants cannot escape liability by arguing the Complaint needs to prove they knew the full extent of how bad things would turn out (*e.g.*, the near bankruptcy from the loss of the majority of PBM business by the end of 2019) at the time they were making their misleading statements in 2018, because it is sufficient to allege they omitted to disclose the negative trends and risks that were occurring at the time of the statements. *See Akorn*, 240 F. Supp. 2d at 817 (finding

- 16 -

statements were false when made because "[t]he statements about Akorn's integration efforts being 'on track' convey a forward-looking belief about the future integration of the acquisitions, but they also convey that the current state of the integration efforts had progressed to a point that made it reasonably likely for Akorn to complete the integration process by a certain time"); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at \*10 (N.D. Ill. Sept. 23, 2008) (finding July statements that new product launch was "'on track'" for holiday season were misleading due to "defendants' omissions regarding the problems plaguing the 3G rollout" at that time even though they were later launched near end of holiday season).[7]

### C. The Totality of Factors Supports a Strong Inference of Scienter

Defendants' analysis of scienter suffers from two flaws. First, defendants try to heighten the standard by arguing there is no ***direct*** evidence they ***knowingly*** made false statements, but ignore that scienter is sufficiently alleged by ***circumstantial*** facts suggesting "'***reckless disregard of a substantial risk*** that the statement is false.'" *Allscripts*, 778 F. Supp. 2d at 883.

Second, defendants isolate individual scienter allegations and then cite a case holding that particular factor "standing alone" did not create a strong inference of scienter in some other case. *See, e.g.*, Br. at 21 (quoting case for proposition that allegation "standing alone" did not establish scienter). But, "courts must consider the complaint in its entirety" and ask "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23 (emphasis in original). Defendants' argument that "'[t]he sum of several zeros . . . is still zero'" is flawed because "inference is not arithmetic" and the "inferential significance of any single allegation can be

---

[7] Defendants claim their internal control statements were not misleading because they were not required to discuss internal controls for the newly acquired PBM businesses, but while the Company's 2017 Form 10-K said the PBM segment was excluded from the internal control analysis, no such language appeared in the quarterly statements at issue here.

- 17 -

determined only by reference to all other allegations." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (reversing dismissal of securities fraud case); *see Norfolk Co. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) (rejecting defendants' attempts at "'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA"). Here, no single allegation must do the job alone, because the totality of allegations are sufficient to allege scienter, especially since the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324.

### 1. Defendants Had Motive to Conceal the Negative Trends

Motive is not required to allege scienter because "there is little if any significance attributable to the absence of an allegation of a personal financial motive." *See Ross*, 2012 WL 5363431, at *11. But, when present, "'motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference.'" *See Hospira*, 2013 WL 566805, at *16.

Here, defendants suggest they had no more than a "generalized" desire to succeed or conduct a transaction (Br. at 24), but they had a far greater motive to conceal the collapse of the recently acquired PBM business because they were actively seeking to acquire other businesses or be acquired (¶¶38-39, 143-148). Having used stock to acquire the PBM businesses, defendants had an incentive to conceal the negative trends in the PBM business to artificially inflate Diplomat's stock price to more cheaply acquire other companies. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (reversing dismissal and stating "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter"). In addition, analysts commented "that the current management team is more open to a transaction than was the previous team" to be acquired. ¶147. The acquisition of Diplomat could result in large payments to defendants for their Diplomat holdings. *See, e.g.*, *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 940 (N.D. Ill. 1999) (finding

- 18 -

that the "'incentive to complete the lucrative sale of a business, and the personal pecuniary benefits associated therewith, can create a strong motive to engage in fraud and, logically, can raise an inference of scienter sufficient to support allegations of fraud'").

### 2.      Defendants' False Statements, Senior Positions, and Personal Involvement Contribute to a Strong Inference of Scienter

The Seventh Circuit has recognized that "'[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.'" *Tellabs I*, 437 F.3d at 603.  In their respective roles as director and Interim CEO (Park), Chairman and CEO (Griffin), CFO and Treasurer (Kavthekar), and President (Saban), defendants were responsible for the successful integration of the PBM business and accurate reporting thereon.  ¶¶110-115. Defendants Park, Griffin, and Saban were hired by Diplomat specifically to integrate, launch, and run the PBM business. ¶115.  Park and Saban had spent decades running some of the largest PBMs in the country, and Kavthekar was appointed Principal Accounting Officer to "lead Diplomat's financial operations."  ¶¶114-115, 119.  In their positions, each defendant had access to internal corporate documents, conversations with officers and employees, attended management and Board meetings, and reviewed reports on the topics they spoke on at the quarterly conference calls.  ¶¶110- 119.  While such allegations may not alone be sufficient to establish scienter, they can contribute to the ***inference***.  *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (stating scienter supported "where the defendants either knew or had access to information showing that their public statements were not accurate").

In addition, each defendant made statements holding themselves out as knowledgeable about the PBM integration and customer issues, confirming their personal involvement in monitoring the success of the PBM acquisition and customer retention.  *See Hospira*, 2013 WL 566805, at *25-*26

- 19 -

(finding scienter adequately alleged and noting argument that it could be inferred that defendants "'knew of what they spoke'"). For example, during the February 26, 2018 conference call, attended by defendants Park, Saban and Kavthekar, Park said "[t]he claim systems we have right now are functioning effectively to really support the services" for both NPS and LDI and "[w]e will be looking to make sure that irrespective of whether we've migrated from one platform to another, that there is no disruption to our member book of business." ¶127; *see Ross*, 2012 WL 5363431, at *10 (finding from CEO's statements about the issue "[o]ne may readily and reasonable [sic] infer from these facts that [the CEO] made it his business to look into" it).[8]

### 3. The Core Operations Doctrine Supports an Inference of Scienter

Defendants say this factor alone is insufficient, but they cannot refute that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'" *Sears*, 291 F. Supp. 2d at 727; *Desai v. Gen. Growth Prop., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (noting "[w]hile the Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue").

Here, nothing was more critical to Diplomat's business than its newly acquired, $647 million PBM business. ¶¶42-45. Defendants admitted as much, for example, with defendant Park stating

---

[8] *See also Lakeland*, 2012 WL 607578, at *4 (finding scienter adequately pled where "by virtue of their positions the defendants had access to non-public and proprietary information concerning [the company's] operations, finances, and financial condition" and "controlled the content" of the public statements and thus "a reasonable person could infer that [the CEO] and the other corporate officer defendants at least acted with deliberate recklessness"); *In re Motorola Sec. Litig.*, 2004 WL 2032769, at *27 (N.D. Ill. Sept. 10, 2004) (holding that defendants' "'access to information contradicting their public statements'" supports a finding that they "'knew or, more importantly, should have known that they were misrepresenting material facts'"); *Sears*, 291 F. Supp. 2d at 727 (holding "[l]ogically, defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements about the portfolio or signing off on SEC filings"); *Allstate*, 2018 WL 1071442, at *5 (holding that defendant's active role in earnings calls and statements relating to misrepresentations supported inference of scienter).

- 20 -

that "[e]ntering the PBM market is critical to our growth strategy" (¶58(a)), and Saban referred to it as "a huge game changer" (¶58(c)). In fact, as an analyst observed, "[t]he questions management has been getting from investors recently are virtually all about the PBM business." ¶120; *see Silverman*, 2008 WL 4360648, at *14 (holding "it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch"); *Asher v. Baxter Int'l, Inc.*, 2005 WL 331572, at *6 (N.D. Ill. Feb. 3, 2005) (finding the inference of scienter for "'high-level managers'" is "particularly strong where the specific problem" affects "'a significant source of income' or a 'core business operation'").

The competing inferences that defendants were not paying attention to the PBM acquisition or were just repeating lies fed to them have routinely been rejected as much less plausible in similar circumstances. *See, e.g.*, *Tellabs III*, 513 F.3d at 709-11 (finding scienter adequately pled and stating "[i]s it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely"); *Ulta*, 604 F. Supp. 2d at 1197 (finding unpersuasive the competing inference that defendants "were essentially clueless as to the major problems existing within the company"). Moreover, when misrepresentations relate to critical business issues facing the Company, courts find that "failure to have such knowledge equate[s] to reckless disregard." *See Lindelow*, 2001 WL 830956, at *8 (holding "it is strongly inferential that every officer or director . . . either had the knowledge" of important matter, "or, if not, that his failure to have such knowledge equated to reckless disregard"); *see also Dardick v. Zimmerman*, 149 F. Supp. 2d 986, 988-89 (N.D. Ill. 2001) (finding "it is surely strongly inferential that every officer or director of [the company] either had the knowledge of [the company's] deep financial difficulties or, if not, that his failure to have such knowledge equated to reckless disregard").

- 21 -

### 4. The Severity of the PBM Collapse Supports Scienter

Similarly, "[t]he more serious the error, the less believable are defendants [sic] protests that they were completely unaware of [the truth] and the stronger is the inference that defendants must have known about the discrepancy." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997). Here, far from being too minor to warrant defendants' close attention and monitoring, the service failures and customer losses drove Diplomat to the verge of bankruptcy. ¶¶108-109. Diplomat acquired the PBM businesses to compete on service more than price (*e.g.*, ¶¶46-50, 58), so it is inconceivable that defendants were unaware at the time of their misleading statements of the negative impact on service level from employee terminations and the migration. *See, e.g.*, *Berson*, 527 F.3d 987-89 (finding scienter could be inferred when the concealed facts would have a "devastating effect on the corporation's revenue" because "it would be 'absurd to suggest' that top management was unaware of them").

### 5. Executive Departures Support a Strong Inference of Scienter

Defendants suggest that the executive departures could have had "benign" reasons. Br. at 24-25. But courts routinely recognize that terminations "lend[] weight to a finding of scienter." *Ross*, 2012 WL 5363431, at *10 (finding inference of scienter supported where CEO and three senior vice presidents resigned one day before disclosure of improprieties).

Here, nearly all the defendants were fired in a series of terminations that followed the corrective disclosures. Specifically, Saban was terminated "effective immediately" after the Company partially corrected defendants' Class Period statements by disclosing massive PBM customer service failings and lost customers. ¶¶85, 133. Park abruptly resigned from the Board a year before his term was set to expire, which was disclosed the same day that the Company disclosed continued PBM losses and the need to write off a "significant portion" of the goodwill related to the failing PBM business. ¶134. Similarly, Kavthekar's employment was terminated just after

- 22 -

defendants further revealed the extent of lost customers and service failures. ¶135. The sheer number and timing of departures supports an inference of scienter. *See, e.g.*, *Akorn*, 240 F. Supp. 3d at 820 (holding that "reinforcing the case for scienter is the allegation that [defendant] resigned in the wake of the restatement, before a replacement CFO was selected").[9]

### 6. Defendants' Obligations Under GAAP Support Scienter

Defendants Park, Griffin and Kavthekar signed publicly-filed financial statements each quarter that reported goodwill as a $447 million asset, of which $191 million was attributed to "customer relationships" from the PBM acquisition. ¶137. Signing those statements required them to monitor the PBM business and its customer relationships. ¶¶138-142; *see In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (stating that "[a]s signatories to the SEC filings that contained the company's financials, each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations"); *Akorn*, 240 F. Supp. 3d at 819 (holding that obligation to supervise company's internal controls added to inference of scienter).

### 7. Defendants' Arguments Lack Merit

Against the totality of these allegations, defendants raise three unavailing arguments. First, unable to rebut the allegations, defendants point to what is missing. The fallacy of doing so is that defendants set the bar so high that it could never be met, suggesting the Complaint needed to identify witnesses and "describe written reports or other documents received by the Individual Defendants regarding these matters" that prove their "contemporaneous knowledge" that their statements were

---

[9]    *See also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (CEO's forced resignation "'add[ed] to the overall pleading of circumstantial evidence of fraud'"); *Kurtzman v. Compaq Comput. Corp.*, 2000 WL 34292632, at *26 (S.D. Tex. Dec. 12, 2000) (finding "the sudden resignation of nearly all the top management . . . within a few days or weeks of the adverse disclosure . . . supports an inference of conscious misbehavior or recklessness").

- 23 -

false. Br. at 17-18. But even at trial "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." Seventh Circuit Pattern Civil Jury Instruction No. 1.12. These cases routinely survive a motion to dismiss despite shareholders' lack of access to internal company documents, and by claiming such documents are required, defendants misstate the law and ignore that allegations supporting an ***inference*** of ***reckless disregard*** are sufficient. *See, e.g.*, *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (plaintiffs do not need "evidence" or "names" of sources because the "PSLRA did not, however, purport to move up the trial to the pleadings stage"); *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 857 (N.D. Ill. 2017) (holding scienter adequately pled in complaint lacking allegations regarding internal documents or confidential witnesses); *Kelsey v. Allin*, 2016 WL 825236, at *5 (N.D. Ill. Mar. 2, 2016) (same).

Second, defendants argue they acted in good faith by disclosing certain customer losses, but as noted, those statements were misleading. At the pleadings stage, their good faith arguments and innocent interpretations of their conflicting statements are premature. *See, e.g.*, *Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1196 (N.D. Ill. 1997) (finding scienter alleged for statements that omitted problems "even if they honestly believed [the problems] would soon be rectified").

Third, defendants' fraud-by-hindsight argument is based on contesting the factual allegations. The PBM business was acquired and integration began before, not during, the Class Period. ¶¶43-56. While defendants now claim that they "had limited visibility into the PBM business's performance" (Br. at 2), during the Class Period they admitted the PBM business "tends to be a very stable, very predictable business" (¶131). As noted, defendants' present claim that the selling season was "compressed" to the end of 2018, making customer losses unknown until "the end of 2018 and into 2019" (Br. at 25), is refuted by their admissions that they were losing customers in May 2018

- 24 -

and that the middle of the selling season was the middle (August) of the year (¶¶60(c), 65(d)).[10]

Moreover, defendants cannot claim investors were not misled because analysts praised defendants for being "open" and transparent about client losses during the Class Period, while ignoring that when the truth was revealed the stock dropped to $3 per share and analysts reported being "very surprised by the magnitude of the [PBM] loss" (¶82). *See Allstate*, 2018 WL 1071442, at *6 (holding the "court disagrees" with "'fraud by hindsight'" argument because defendant's post class period statement "does not merely indicate that his assurances to investors that Allstate's increase in claims frequency was due to external factors were incorrect in retrospect; it suggests that they were incorrect when made").[11]

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be denied.

DATED: June 23, 2020

ROBBINS GELLER RUDMAN
& DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)
WILLIAM J. EDELMAN (IL Bar # 6332368)
GINA M. BUSCHATZKE (IL Bar # 6332510)

s/ James E. Barz
JAMES E. BARZ

---

[10]    *See* ¶96 (analysts reporting on 2018 customer losses, stating there was "no single outsized contract that was lost, but rather there are various individual small contract losses that culminate in a seemingly large headwind," and those "contract losses have a spread out end date through 2019" (*i.e.*, contracts lost were not all year-end 2018 contracts with year-end 2019 dates); ¶101 (defendant Griffin admitted losses were from "service issues that we experienced during that transition period" not after). Defendants ignore the totality of allegations and focus on a single statement to claim certain issues arose in the middle of the third quarter, but that statement referred to the middle of 2018 through the third quarter of 2018. *See* ¶100 (defendant Griffin stated "in terms of the reason behind the contract losses, I'd say that there were clearly during mid to through third quarter of '18 service issues connected to that transition").

[11]    Since a §10(b) violation has been alleged, so has a control person claim under §20(a) been adequately alleged. *Takara*, 429 F. Supp. 2d at 983.

- 25 -

200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
wedelman@rgrdlaw.com
gbuschatzke@rgrdlaw.com

Lead Counsel for Lead Plaintiff

ASHERKELLY
MICHAEL J. ASHER
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
masher@asherkellylaw.com

HESSIAN & McKASY P.A.
WILLIAM A. CUMMINGS
3700 RBC Plaza
60 South 6th Street
Minneapolis, MN  55402
Telephone:  612/746-5770
612/746-5755 (fax)

Additional Counsel for Lead Plaintiff

HOLZER & HOLZER, LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com

Counsel for Plaintiff Eugene Klabak

- 26 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 23, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

E-mail: jbarz@rgrdlaw.com

Cases\4850-7820-1272.v1-6/23/20

Case: 1:19-cv-01735 Document #: 105 Filed: 06/23/20 Page 35 of 35 PageID #:2056

# Mailing Information for a Case 1:19-cv-01735 Iron Workers Local No. 25 Pension Fund, et al., v. Diplomat Pharmacy, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James Wallace Ducayet**
  jducayet@sidley.com,james-ducayet-9115@ecf.pacerpro.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,ajewell@millerlawllc.com,drobinson@millerlawllc.com,JRamirez@millerlawllc.com

- **Matthew Todd Hurst**
  mhurst@heffnerhurst.com,mheffner@heffnerhurst.com

- **Carl V. Malmstrom**
  malmstrom@whafh.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,drobinson@millerlawlllc.com,JRamirez@millerlawllc.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com,E_File_SD@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Andrew Flynn Rodheim**
  arodheim@sidley.com,efilingnotice@sidley.com,andy-rodheim-4196@ecf.pacerpro.com

- **Nicholas Kringlee Tygesson**
  ntygesso@sidley.com,nicholas-tygesson-2848@ecf.pacerpro.com,efilingnotce@sidley.com

- **Nilofer Ibrahim Umar**
  numar@sidley.com,efilingnotice@sidley.com,nilofer-umar-6698@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)